IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-----------------------------------------------------x
                                        :
ELLEN MURRAY                            :      3:11 CV 629 (JGM)
                                        :
v.                                      :
                                        :
TOWN OF STRATFORD, ET AL.               :
                                        :      DATE: FEBRUARY 11, 2014
-----------------------------------------------------x
```

RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND ON PLAINTIFF'S MOTIONS TO STRIKE

On April 20, 2011, plaintiff Ellen Murray, a now-retired Assistant Fire Chief in the Stratford Fire Department, commenced this gender discrimination action against defendants Town of Stratford ["defendant Town" or Town of Stratford], and James Miron, individually and in his official capacity as the Mayor of the Town of Stratford. (Dkt. #1). On September 19, 2011, plaintiff filed an Amended Complaint (Dkt. #29), in which she alleges that the defendant Town discriminated against her because of her gender, in their refusal to promote her, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, and the Civil Rights Act of 1991, and CONN. GEN. STAT. § 46a-60(a)(1)(Counts One & Three); the defendant Town has discriminated against her based on gender plus race in violation of Title VII (Count Two); the defendant Town has taken affirmative disciplinary actions in violation of CONN. GEN. STAT. § 31-51q in punishing plaintiff for the exercise of her right to free speech and free association under the First Amendment to the United States Constitution and/or by exercising her rights under Sections 3, 4, or 14 of Article first of the Connecticut Constitution (Count Four); defendant Miron has retaliated against plaintiff under 42 U.S.C. § 1983 for her exercise of right of association pursuant to the First Amendment (Counts Five & Six); and defendant Miron deprived her equal protection, in violation of 42 U.S.C. § 1983,

through his illegal conduct, in his official and individual capacities (Counts Seven & Eight).

On August 29, 2011, the defendant Town filed its First Motion to Dismiss Count Four of Plaintiff's Complaint.  (Dkt. #30; see Dkts. ##21, 24-27, 31-32).  On February 8, 2012, the parties consented to trial before this Magistrate Judge  and the case was transferred from U.S. District Judge Janet Bond Arterton to this Magistrate Judge.  (Dkt. #37).  On May 3, 2012, this Magistrate Judge filed a Ruling on Defendant Town of Stratford's Motion to Dismiss the Fourth Cause of Action, granting defendant Town's Motion on grounds that plaintiff failed to allege that she was subjected to "discipline" within the meaning of CONN. GEN. STAT. § 31-51q.  (Dkt. #51).    Thereafter, on July 10, 2012, defendants filed their Answers and Affirmative Defense.  (Dkts. ##56-57).

On June 21, 2013, the defendant Town  filed its Motion for Summary Judgment, with brief and exhibits in support (Dkt. #75),[1] and defendant Town's Local Rule 56(a)1 Statement ["Defendants' 56(a)1 Stmt"].  (Dkt. #76).[2]  The same day, defendant Miron filed his Motion for Summary Judgment, with brief and exhibits in support (Dkt. #77),[3] and defendant Miron's

---

[1]Attached to the Town's motion are the following exhibits: copies of case law (Exh. A); copy of reference summary for Curtis Maffett, dated May 18, 2009 ["Maffett Reference Summary"] (Exh. B); affidavit of John Slavin, sworn to April 18, 2013 ["Slavin Aff't"](Exh C.); copy of resume and qualifications of Robert J. Kepchar, dated March 2009 ["Kepchar Resume"](Exh. D); copy of resume and employment application of Curtis Maffett ["Maffett Resume"](Exh. E); copy of resume of plaintiff ["Plaintiff's Resume"](Exh. F); affidavit of James Cavanaugh, sworn to April 15, 2013 ["Cavanaugh Aff't"](Exh. G); affidavit of David Dunn, sworn to April 19, 2013 ["Dunn Aff't"](Exh. H); affidavit of James Miron, sworn to April 18, 2013 ["Miron Aff't"](Exh. I); and copy of excerpts from Miron's deposition, taken on May 29, 2012 ["Miron Depo."], copy of excerpts from Cavanaugh's deposition, taken on January 22, 2013 ["Cavanaugh Depo."], and copy of excerpts from plaintiff's deposition, taken on March 21, 2012 ["Plaintiff's Depo."](Exh. J).

[2]See note 4 infra.

[3]Attached to defendant Miron's motion are copies of the same exhibits attached to the Town's Motion.  See note 1 supra.

Local Rule 56(a)1 Statement.  (Dkt. #78).[4]  Also, on that same day, plaintiff filed her Motion for Partial Summary Judgment, with brief, Local Rule 56(a)1 Statement ["Plaintiff's 56(a)1 Stmt"], and exhibits in support.  (Dkt. #79).[5]

On August 22, 2013, defendants filed their joint brief in opposition to plaintiff's Motion (Dkt. #83),[6] and Local Rule 56(a)2 Statement ["Defendants' 56(a)2 Stmt"]. (Dkt. #84).  On the same day, plaintiff filed her brief in opposition to defendant Miron's Motion for Summary Judgment with exhibits and Plaintiff's Local Rule 56(a)2 Statement in Response to Defendant Miron's Local Rule 56(a)1 Statement ["Plaintiff's 56(a)2 Stmt"](Dkt. #88),[7] as well as her

---

[4]Defendant Town and defendant Miron filed identical Local Rule 56(a)1 Statements, so for ease of reference, the Court will refer to them as "Defendants' 56(a)1 Stmt" rather than referring to them separately.  (See Dkts. ##76, 78).

[5]Attached to plaintiff's motion are the following exhibits: copy of defendant Miron's Responses & Objections to Plaintiff's Requests to Admit, dated October 5, 2012 ["Miron's Resp. 10/5/12"](Exh. A); defendant Town of Stratford's Responses to Plaintiff's Second Request for Admission, dated October 5, 2012 ["Town's Resp. 10/5/12"](Exh. B); another copy of excerpts from the Cavanaugh Depo. (Exh. C); another copy of excerpts from the Miron Depo. (Exh. D); affidavit of Thomas Murray, sworn to June 14, 2013 ["T. Murray Aff't"](Exh. E); affidavit of Daniel P. Hunsberger, sworn to June 21, 2013 ["Hunsberger Aff't"](Exh. F); copy of plaintiff's affidavit before the Connecticut Commission on Human Rights and Opportunities, sworn to February 15, 2010 (Exh. G); affidavit of Jay Cybart, sworn to June 14, 2013 ["Cybart Aff't"](Exh. H); and copy of additional excerpts from Plaintiff's Depo. (Exh. I).

[6]Attached to defendants' brief in opposition are the following exhibits: another copy of excerpts from Plaintiff's Depo. and additional excerpts from the Miron Depo. (Exh. A); another copy of the Dunn Aff't (Exh. B); another copy of the Maffett Reference Summary (Exh. C); another copy of the Slavin Aff't (Exh. D); another copy of the Kepchar Resume (Exh. E); another copy of the Maffett Resume (Exh. F); another copy of the Cavanaugh Aff't (Exh. G); another copy of Plaintiff's Resume (Exh. H); copy of case law (Exh. I); and another copy of defendant Miron's Responses & Objections to Plaintiff's Requests to Admit (Exh. J).

[7]Attached to plaintiff's brief in opposition to defendant Miron's motion are the following exhibits: copies of plaintiff's employment application "Exh. E," and another copy of the Maffett Resume "Exh. F"; copy of additional excerpts from Plaintiff's Depo. (Exh. A); copy of list of Deputy Fire Chief Applicants (Exh. B); another copy of excerpts from the Cavanaugh Depo. (Exh. C); copy of Deputy Fire Chief Interview Schedule, questions, scoring sheet and questionnaire (Exh. D); copy of Kepchar's completed questionnaire, another copy of Kepchar's Resume and a copy of Kepchar's Reference Summary (Exh. E); affidavit of John P. Conway, Jr., sworn to August 19, 2013 (Exh. F); affidavit of Greg Anderson, sworn to August 16, 2013 ["Anderson Aff't"](Exh. G), attached to which is a copy of the Town of Stratford's Proposals for the Local 998 Negotiations on Assistant Chiefs, dated July 2, 2009 (Subexh. A), copy of the grievance (Subexh. B), copies of e-mails between the

brief in opposition to defendant Town's Motion for Summary Judgment and plaintiff's Local Rule 56(a)2 Statement in Response to Defendant Town's Local Rule 56(a)1 Statement.  (Dkt. #89).[8]

On that same day, plaintiff also filed her Motion to Strike four exhibits attached to defendant Miron's Motion, with brief in support (Dkt. #86), and her Motion to Strike four exhibits attached to the defendant Town's motion, with brief in support (Dkt. #87) on grounds that these exhibits are not in admissible form.  On September 19, 2013, plaintiff filed her Motion to Strike defendants' brief in opposition to plaintiff's Motion for Partial Summary Judgment on grounds that four exhibits were filed in inadmissible form.  (Dkt. #97).

Also on September 19, 2013, plaintiff filed her reply brief in further support of her Motion for Partial Summary Judgment.  (Dkt. #98).[9]  On the same day, defendants filed their response to plaintiff's Motions to Strike and affidavit in support (Dkts. #99-100),[10] and defendants filed a joint reply brief in further support of their Motions for Summary Judgment.

---

Union and the Town's Human Resources Director, dated September 20 & December 21, 2011, January 5, January 11 & February 15, 2012 (Subexhs. C-G); copy of RFP presented by Randi Frank and Robert E. Slavin (Exh. H); copy of affidavit of James Miron from Gugliotti v. Miron, 3:08 CV 442 (JCH), sworn to September 14, 2009 (Exh. I); copy of defendant Miron's Responses & Objections to Plaintiff's Requests to Admit, dated May 14, 2012 (Exh. J); and a copy of defendant Town of Stratford's Responses & Objections to Plaintiff's Requests to Admit, dated May 14, 2012 (Exh. K).

[8]In this Local Rule 56(a)2 Statement in response to defendant Town's 56(a)2 Statement, plaintiff incorporates by reference the entirety of her Local Rule 56(a)2 Statement filed in response to defendant Miron's 56(a) 1 Statement. (Dkt. #89).  Thus, for ease of the reference, the Court will only refer to a single plaintiff's 56(a)2 Statement instead of two identical ones.

[9]Attached to plaintiff's reply brief are the following exhibits: copy of Executive Summary (Exh. A); and copy of Connecticut Fire Academy Course Calendar for 2009 (Exh. B).

[10]The same exhibits were attached both to defendants' reply brief and to the affidavit: affidavit of Ronald Ing, sworn to September 19, 2013 ["Ing Aff't"](Exh. A); another copy of the Maffett Reference Summary (Exh. B); another copy of the Kepchar Resume (Exh. C, mislabeled Exh. D); another copy of the Maffett Resume (Exh. D, mislabeled Exh. E); and another copy of Plaintiff's Resume (Exh. E, mislabeled Exh. F).

(Dkt. #101).

For the reasons stated below, defendant Town of Stratford's Motion for Summary Judgment (Dkt. #75) is <u>granted in part and denied in part</u>; defendant Miron's Motion for Summary Judgment (Dkt. #77) is <u>granted in part and denied in part</u>; plaintiff's Motion for Partial Summary Judgment (Dkt. #79) is <u>denied</u>; and plaintiff's Motions to Strike (Dkts. ##86, 87, 97) are <u>denied</u>.

## I. FACTUAL BACKGROUND[11]

Plaintiff was employed by the Town of Stratford in the Stratford Fire Department ["SFD"] for twenty-seven years and nine months from 1982 to 2010, and she was one of four Assistant Fire Chiefs from January 2007 to 2010.  (Plaintiff's Local Rule 56(a)1 Statement ¶¶ 1, 4; Defendants' Local Rule 56(a)2 Statement ¶¶ 1, 4; Defendants' 56(a)1 Stmt ¶¶ 1, 3; Plaintiff's 56(a)2 Stmt ¶¶  1, 4; Undisputed Facts ¶¶ 5-6, 11-12, 15, 25, 34). The position of assistant chief is below only those of fire chief and deputy fire chief.  (Defendant Town's 56(a)1 Stmt ¶ 2; Defendant Miron's 56(a)1 Stmt ¶ 2; Plaintiff's 56(a)2 Stmt ¶ 2). Plaintiff is a white female.   (Undisputed Facts ¶10).  Defendant Miron was the Mayor of Stratford from December 2005 to December 2009.  (Plaintiff's 56(a)1 Stmt ¶ 2; Defendants' 56(a)2 Stmt ¶ 2; Undisputed Facts ¶ 7).

### A. UNION INVOLVEMENT

---

[11]This factual summary is drawn from the parties' Local Rule 56(a)1 Statements, Local Rule 56(a)2 Statements, and their accompanying affidavits, deposition transcripts, and exhibits.  The Court also relies upon the forty-two paragraph Statement of Undisputed Facts found in the parties' Rule 26(f) Report of Parties' Planning Meeting, filed June 27, 2011 ["Undisputed Facts"](Dkt. #13).

As discussed in Section II.A.3. <u>infra</u>, plaintiff's Motions to Strike (Dkts. ##86-87, 97) are <u>denied</u> and thus the Court will address the challenged exhibits as appropriate.

Plaintiff was a member of the firefighter's union, Local 998, from 1982 until she was promoted to Assistant Chief in January 2007. (Plaintiff's 56(a)1 Stmt ¶ 5; Defendants' 56(a)2 Stmt ¶ 5; Miron's Resp. 10/5/12 ¶ 6; Town's Resp. 10/5/12 ¶ 6). Plaintiff's husband, Thomas Murray, was an Assistant Chief in the SFD and was an active participant in the union, serving on numerous boards and committees. (Plaintiff's 56(a)1 Stmt ¶ 6; Defendants' 56(a)2 Stmt ¶ 6; Undisputed Facts, ¶ 10; Miron's Resp. 10/5/12 ¶¶ 10-16, 50-52; Town's Resp. 10/5/12 ¶¶ 10-16, 50-52). In his work with the firefighter's union, Assistant Chief Thomas Murray was particularly involved in matters related to municipal pensions, and he was regarded as the "go-to" person for firefighters with department issues, union issues, and legal issues. (Plaintiff's 56(a)1 Stmt ¶ 7; Defendants' 56(a)2 Stmt ¶ 7; Cavanaugh Depo. at 107-08). His active involvement in the firefighter's union and advocacy for members of the SFD resulted in him not being well-liked within Stratford Town Hall. (Plaintiff's 56(a)1 Stmt ¶ 8; Defendants' 56(a)2 Stmt ¶ 8; Cavanaugh Depo. at 110). Plaintiff was as enthusiastic, interested, and dedicated to the firefighter's union as her husband. (Plaintiff's 56(a)1 Stmt ¶ 9; Defendants' 56(a)2 Stmt ¶ 9; Cavanaugh Depo. at 108). The Assistant Chiefs of the SFD rejoined the firefighter's union in September 2008 after extensive, contentious negotiations with the Town. (Plaintiff's 56(a)1 Stmt ¶ 10; Defendants' 56(a)2 Stmt ¶ 10; Undisputed Facts ¶¶ 16-17; Cavanaugh Depo. at 106; Miron Depo. at 109). During these negotiations, defendant Miron had discussions with several Assistant Chiefs, including Assistant Chief Thomas Murray, who were supportive of the Assistant Chiefs rejoining the union. (Plaintiff's 56(a)1 Stmt ¶ 13; Defendants' 56(a)2 Stmt ¶ 13; Miron Depo. at 196). Plaintiff rejoined the firefighter's union in 2008 and continued to be a union member until she left the SFD. (Plaintiff's 56(a)1 Stmt ¶ 14; Defendants' 56(a)2 Stmt ¶ 14; Miron's Resp. 10/5/12 ¶ 7;

Town's Resp. 10/5/12 ¶ 7).

James Cavanaugh ["Chief Cavanaugh"] was Fire Chief from June 2009 to January 2013.  (Plaintiff's 56(a) 1 Stmt ¶ 3; P; Defendants' 56(a)2 Stmt ¶ 3; Undisputed Facts ¶ 19). When Chief Cavanaugh interviewed for the position of Interim Fire Chief, defendant Miron told Cavanaugh that cost containment was needed in the SFD.  (Plaintiff's 56(a)1 Stmt ¶ 16; Defendants' 56(a)2 Stmt ¶ 16; Cavanaugh Depo. at 41).  The first opportunity to cut costs associated with the SFD occurred when the firefighter's collective bargaining agreement came up for negotiation, at which time the Town focused exclusively on the salary and benefits of the firefighters, and was not willing to consider reducing costs by other means.  (Plaintiff's 56(a)1 Stmt ¶ 17; Defendants' 56(a)2 Stmt ¶ 17; Cavanaugh Depo. at 42-43).  According to Chief Cavanaugh, the SFD had a "tremendous" union contract and the Town was going to "attack" the firefighter's union in the negotiation process.  (Plaintiff's 56(a)1 Stmt ¶ 18; Defendants' 56(a)2 Stmt ¶ 18; Cavanaugh Depo. at 38).

When defendant Miron decided to run for Mayor, he sought to address several issues affecting the Town, including the reduction of Town costs, which defendant Miron identified as a major issue.  (Plaintiff's 56(a)1 Stmt ¶ 19; Defendants' 56(a)2 Stmt ¶ 19; Miron Depo. at 51, 55).  Defendant Miron admitted that he took all factors into consideration when hiring someone, that he did not look at matters in a vacuum when making employment decisions, and that he looked at "how the real world affects decisions." (Plaintiff's 56(a)1 Stmt ¶ 20; Defendants' 56(a)2 Stmt ¶ 20; Miron Depo. at 87). During his administration, defendant Miron was involved in negotiating several collective bargaining agreements and would try to keep raises as small as possible.  (Plaintiff's 56(a)1 Stmt ¶ 21; Defendants' 56(a)2 Stmt ¶ 21; Miron Depo. at 97, 101).

Defendant Miron admitted that overtime costs and pension costs were big concerns for him; specifically, he was concerned with the fact that the SFD would routinely exceed its overtime budget. (Plaintiff's 56(a)1 Stmt ¶ 27; Defendants' 56(a)2 Stmt ¶ 27; Miron Depo. at 172, 175).   The firefighter's union was the only bargaining unit in the Town that had overtime included in the compensation used to calculate a firefighter's pension benefit, as set forth in the pension agreement negotiated between the firefighter's union and the Town. (Plaintiff's 56(a)1 Stmt ¶¶ 28-29; Defendants' 56(a)2 Stmt ¶¶ 28-29; Miron Depo. at 175, 177).   Defendant Miron saw the inclusion of overtime in the pension calculation as a problem because it increased the Town's liability for prospective pension benefits.  (Plaintiff's 56(a)1 Stmt ¶ 30; Defendants' 56(a)2 Stmt ¶ 30; Miron Depo. at 175).   Thus, in accord with the Town's position to try to control costs by various means, defendant Miron sought to limit the scope of the term "compensation" in the pension agreement to exclude overtime pay in the calculation of firefighters' pension benefits, but the firefighter's union would not agree to that change.  (Plaintiff's 56(a)1 Stmt ¶¶ 31, 36; Defendants' 56(a)2 Stmt ¶¶  31, 36; Miron Depo. at 177; Cavanaugh Depo. at 37).   Defendant Miron admitted that the Mayor and a member of a collective bargaining unit have different roles, and while both aim to ensure that the public gets a "good value" for their public officials, members of a collective bargaining unit have a different take on how that looks.  (Plaintiff's 56(a)1 Stmt ¶ 37; Defendants' 56(a)2 Stmt ¶ 37; Miron Depo. at 187). Chief Cavanaugh admitted that the Town was "always at odds with the union[,]" and that "Civil Service, Human Resources and unions don't mix." (Plaintiff's 56(a)1 Stmt ¶¶ 43-44; Defendants' 56(a)2 Stmt ¶¶ 43-44; Cavanaugh Depo. at 106).

B. HIRING OF THE DEPUTY FIRE CHIEF

In February 2009, two management positions within the SFD became available -- fire chief and deputy fire chief.  (Defendants' 56(a)1 Stmt ¶ 4; Plaintiff's 56(a)2 Stmt ¶ 4; Undisputed Facts ¶ 20).  In order to perform a nationwide search for candidates to fill the positions of fire chief and deputy fire chief, along with the deputy police chief, the Town retained Randi Frank Consultants and Slavin Management Consultants [collectively "Randi Frank"].  (Defendants' 56(a)1 Stmt ¶ 5; Plaintiff's 56(a)2 Stmt ¶ 5; Undisputed Facts ¶¶ 21, 31).  Randi Frank created job descriptions and qualifications for the positions, advertised the positions, developed an interview syllabus and job-specific questionnaires, and designed a grading rubric.  (Defendants' 56(a)1 Stmt ¶ 6; Plaintiff's 56(a)2 Stmt ¶ 5; Undisputed Facts ¶ 32).

The job announcement for the position of deputy fire chief advised:

> The Town of Stratford, CT is seeking a Deputy Fire Chief for its 97-member department with a 10.2 million dollar operating budget.  The position is the second-in-command and is responsible for fire suppression and the day-to-day direction of the department.  Candidates should have a [b]achelor's degree in fire service management or a related area, and at least ten (10) years of progressively responsible fire service experience, including at least two (2) years at the shift supervisor level, or higher, in a municipal fire department comparable in size to Stratford or larger.  Candidates should also possess, or be able to obtain, certifications as Fire Officer I and Fire Instructor I issued by the State of Connecticut.  At least three years previous experience as a Deputy Chief in a comparably, or larger, sized fire department may be substituted for a [b]achelor's degree.  Fire Officer II or III certification or a [m]aster's degree in fire service management or a related field or graduation from the Executive Officer Program at the National Fire Academy is preferred. A valid driver's license is required.

(Defendants' 56(a)1 Stmt ¶ 7; Plaintiff's 56(a)2 Stmt ¶ 7; Undisputed Facts ¶ 33).

At the time she applied for this position, plaintiff possessed a bachelor's degree in physical education, and she represented that she was working towards a master's degree in public safety.  (Defendants' 56(a)1 Stmt ¶¶ 8, 10; Plaintiff's 56(a)2 Stmt ¶¶ 8, 10; Plaintiff's

Depo. at 14-15; Plaintiff's Resume).  The master's degree in public safety was from an on-line university, and to date, plaintiff has only taken one class towards that degree.  (Defendants' 56(a)1 Stmt ¶ 11; Plaintiff's 56(a)2 Stmt ¶ 11; Plaintiff's Depo. at 15-16).  Plaintiff applied for the position of deputy chief, advanced to a stage in the application process at which she could fill out a job-related questionnaire, and then advanced to an interview stage with three other finalists for the position.  (Plaintiff's 56(a)1 Stmt ¶ 23, n.2; Defendants' 56(a)2 Stmt ¶ 23; Defendants' 56(a)1 Stmt ¶ 12; Plaintiff's 56(a)2 Stmt ¶ 12; Undisputed Facts ¶¶ 35, 37).  The other three finalists were Thomas Connor, a white male from Bridgeport Fire Department, Robert Kepchar, a white male from the Westport Fire Department, and Curtis Maffett, a black male who was a retired assistant to the chief from the Columbia, South Carolina Fire Department.  (Plaintiff's 56(a)1 Stmt ¶ 23, n.2; Defendants' 56(a)2 Stmt ¶ 23; Defendants' 56(a)1 Stmt ¶ 13; Plaintiff's 56(a)2 Stmt ¶ 13; Undisputed Facts, ¶¶ 38-40; Cavanaugh Aff't ¶ 7; Miron Aff't ¶ 7).   On his resume, Kepchar represented that he had thirty years of experience as a member of the Westport Fire Department, including five years as an assistant chief, and had overseen the hiring process of sixteen firefighters.  (Defendants' 56(a)1 Stmt ¶ 15; Kepchar Resume).[12]  Maffett represented that he had thirty-four years of experience as a member of the Columbia, South Carolina Fire Department, including nine years as an assistant chief of operations/human resources and five years experience overseeing recruiting, hiring, and promotions.  (Defendants' 56(a)1 Stmt ¶ 16; Maffett Resume).[13] Plaintiff represented that she had twenty-six years of experience as a member

---

[12]Kepchar's resume is one of the four exhibits that plaintiff seeks to have stricken by the Court.  See Section II.A.3. infra.

[13]Maffett's resume is another of the four exhibits that plaintiff seeks to have stricken by the Court.  See Section II.A.3. infra.

of the SFD, including two years as an assistant chief.  (Defendants' 56(a)1 Stmt ¶ 17; Plaintiff's 56(a)2 Stmt ¶ 17; Plaintiff's Resume).  After the interview process, O'Connor's application did not receive any further consideration.  (Defendants' 56(a)1 Stmt ¶ 14; P's 56(a)2 Stmt ¶ 14; Miron Aff't ¶¶ 7-8; Cavanaugh Depo. at 73).

Cost containment was, again, a major issue facing the Town when defendant Miron considered plaintiff's candidacy for the deputy chief position.  (Plaintiff's 56(a)1 Stmt ¶ 22; Defendants' 56(a)2 Stmt ¶ 22; Miron Depo. at 156).  Defendant Miron admitted that the exact purpose of interviewing the three finalists for the position of deputy chief was to find the right fit for his administration, to determine how he would work together with each candidate, and to determine whether he and the candidate had the same goals and objectives moving forward.  (Plaintiff's 56(a)1 Stmt ¶¶ 23-24; Defendants' 56(a)2 Stmt ¶¶ 23-24; Miron Depo. at 166-67).  Defendant Miron admitted that he would disqualify a candidate for the position of Deputy Chief if that candidate did not support his viewpoint that overtime expenses in the SFD needed to be reduced, and he admitted that grievances filed by the firefighter's union against the Town, related to allegations that the Town bargained in bad faith regarding the Assistant Chiefs rejoining the firefighter's union, were expensive for the Town.  (Plaintiff's 56(a)1 Stmt ¶¶ 25-26; Defendants' 56(a)2 Stmt ¶¶ 25-26; Miron Depo. at 167-68,170-71).

The panel that interviewed the final three candidates for the position of deputy chief ["Panel"] included Edmund Winterbottom, the Director of Human Resources, Susan McCauley, the Director of Finance, a representative from Randi Frank, and Chief Cavanaugh.  (Plaintiff's 56(a)1 Stmt ¶ 38; Defendants' 56(a)2 Stmt ¶ 38; Cavanaugh Depo. at 67, Miron Depo. at 148; see also Plaintiff's 56(a)1 Stmt ¶ 11 (explaining Winterbottom's position; Defendants 56(a)1 Stmt ¶ 14 (same)).  The Panel asked Kepchar if he had any experience negotiating

with unions.  (Plaintiff's 56(a)1 Stmt ¶ 39; Defendants' 56(a)2 Stmt ¶ 39; Cavanaugh Dep. at 72).  The Panel was particularly impressed with Kepchar because he created a program to reduce overtime costs in the Westport Fire Department.  (Plaintiff's 56(a)1 Stmt ¶ 40; Defendants' 56(a)2 Stmt ¶ 40; Defendants' 56(a)1 Stmt ¶ 20; Plaintiff's 56(a)2 Stmt ¶ 20; Cavanaugh Depo. at 73-74).  Kepchar also had experience "organizing other sections, other areas of the department . . . [and] came up with two or three programs that he had just completed that impressed" the Panel, including Chief Cavanaugh, because Kepchar's experience covered "a lot of the things that we needed to do."  (Defendants' 56(a)1 Stmt ¶ 21; Plaintiff's 56(a)2 Stmt ¶ 21; Cavanaugh Depo. at 73-74; Cavanaugh Aff't ¶ 10).

In addition to having worked in a much larger fire department than the SFD (Defendants' 56(a)1 Stmt ¶ 22; Plaintiff's 56(a)2 Stmt ¶ 22; Cavanaugh Depo. at 87; Cavanaugh Aff't ¶¶ 12-13), Maffett had experience operating in a "right to work" state, which does not require employees to join a union even if one exists, and this experience "perked quite an interest in the [T]own" as the Panel thought that Maffett's background "could bring something new to the table."  (Plaintiff's 56(a)1 Stmt ¶ 41; Defendants' 56(a)2 Stmt ¶ 41; Cavanaugh Depo. at 88).  Chief Cavanaugh admitted that he viewed Maffett's experience in a right to work state as a positive because it could have provided insight into how those municipalities operate and "get around the union[.]"  (Plaintiff's 56(a)1 Stmt ¶ 42; Defendants' 56(a)2 Stmt ¶ 42; Cavanaugh Depo. at 88).

During the Panel's discussion of plaintiff's candidacy, Winterbottom and McCauley initially raised a concern that plaintiff's union activity and Assistant Chief Thomas Murray's union activity might make plaintiff a less effective deputy chief.  (Plaintiff's 56(a)1 Stmt ¶ 45; Defendants' 56(a)2 Stmt ¶ 45; Cavanaugh Depo. at 109).  Defendant Miron, as Mayor,

conducted the final interview of the remaining three candidates.  (Defendants' 56(a)1 Stmt ¶ 23; Plaintiff's 56(a)2 Stmt ¶ 23; Miron Depo. at 167-68; Miron Aff't ¶¶ 8-9).

Despite her qualifications, plaintiff was not promoted to the position of deputy chief. (Plaintiff's 56(a)1 Stmt ¶¶ 46-47; Defendants' 56(a)2 Stmt ¶¶ 46-47).  Following the final interviews by defendant Miron, the position of deputy was offered to Kepchar, who then attempted to negotiate the salary offered for the position, which led the defendant Town to withdraw its offer to Kepchar.  (Plaintiff's 56(a)1 Stmt ¶ 57, n.7; Defendants' 56(a)2 Stmt ¶ 57; Defendant's 56(a)1 Stmt ¶ 24; Plaintiff's 56(a)2 Stmt ¶ 24; Miron Aff't ¶ 10; Cavanaugh Aff't ¶ 19; Miron Depo. at 182-83; Cavanaugh Depo. at 92-93).  Following the withdrawal of the offer to Kepchar, the defendant Town offered the position to Maffett, who was hired as Deputy Chief in August 2009.  (Defendants' 56(a)1 Stmt ¶ 25; Plaintiff's 56(a)2 Stmt ¶ 25; Plaintiff's 56(a)1 Stmt ¶ 57; Defendants' 56(a)2 Stmt ¶ 57; Undisputed Facts ¶ 42; Miron Aff't ¶ 11; Cavanaugh Aff't ¶ 20).

Plaintiff thereafter filed a charge of discrimination against defendants with the State of Connecticut Commission on Human Rights and Opportunities ["CCHRO"] and with the Equal Employment Opportunity Commission, received a right-to-sue letter from the United States Department of Justice and a release of jurisdiction letter from the CCHRO, and commenced this instant lawsuit.  (Defendants' 56(a)1 Stmt ¶ 26; Plaintiff's 56(a)2 Stmt ¶ 26; Undisputed Facts, ¶¶ 1-4).

Plaintiff previously had engaged in litigation against the Town, alleging that she was denied a promotion to assistant chief on the basis of her gender and that the Town permitted the existence of a hostile work environment.  (Defendants' 56(a)1 Stmt ¶ 27; Plaintiff's 56(a)2 Stmt ¶ 27; Howley v. Town of Stratford, 217 F.3d 141 (2d Cir. 2000)).  In that case,

the District Court granted summary judgment in favor of the Town and the Second Circuit reversed, remanding the case for trial on the hostile work environment claim and for further proceedings consistent with its statement that it did "not foreclose the possibility that summary judgment dismissing the failure-to-promote claim may be appropriate if [the plaintiff] fails to come forward with legally sufficient evidence to support" an inference that the selected candidate "was chosen in preference to her because of her gender." (Defendants' 56(a)1 Stmt ¶ 28; Plaintiff's 56(a)2 Stmt ¶ 28; Howley, 217 F.3d at 153). A settlement was reached in that case prior to trial.  (Defendants' 56(a)1 Stmt ¶ 29; Plaintiff's 56(a)2 Stmt ¶ 29; Plaintiff's Depo. at 9).

### C. OTHER HIRES WITHIN THE SFD

Brian Lampart was promoted from Lieutenant to Assistant Chief Fire Marshal after Assistant Chief Velky retired.  (Plaintiff's 56(a)1 Stmt ¶ 48; Defendants' 56(a)2 Stmt ¶ 48; Plaintiff's Depo. at 160-61).   The Town did not post a job announcement to accept applications for the position of Assistant Chief Fire Marshal.  (Plaintiff's 56(a)1 Stmt ¶ 49; Defendants' 56(a)2 Stmt ¶ 49; Plaintiff's Depo. at 161).  Assistant Chief Lampart did not have to take an examination before being promoted, as was customary with the positions of Fire Marshal and Assistant Chief, and he had the option to petition to become part of the firefighter's union, but chose not to.  (Plaintiff's 56(a)1 Stmt ¶¶ 50-51; Defendants' 56(a)2 Stmt ¶¶ 50-51; Plaintiff's Depo. at 161).  Defendant Miron later promoted Assistant Chief Lampart to Deputy Chief and approved a pay raise.  (Plaintiff's 56(a)1 Stmt ¶ 52; Defendants' 56(a)2 Stmt ¶ 52; Plaintiff's Depo. at 161).

In 1990, Roger Macy was promoted from Assistant Chief to Deputy Chief and later went on to become Fire Chief.  (Plaintiff's 56(a)1 Stmt ¶ 53; Defendants' 56(a)2 Stmt ¶ 53).

In 1994, Ron Nattrass, from West Haven, was hired as Deputy Chief at a time where there were no internal candidates interested in the Deputy Chief position. (Plaintiff's 56(a)1 Stmt ¶ 54; Defendants' 56(a)2 Stmt ¶ 54). In March 2000, Assistant Chief Jay Cybart was promoted to Deputy Chief and later went on to become Fire Chief, at which time Michael Hostetter was promoted from Assistant Chief to Deputy Chief. (Plaintiff's 56(a)1 Stmt ¶¶ 55-56; Defendants' 56(a)2 Stmt ¶¶ 55-56).

## II. DISCUSSION

### A. PENDING MOTIONS

#### 1. DEFENDANT TOWN OF STRATFORD'S AND DEFENDANT MIRON'S MOTION FOR SUMMARY JUDGMENT

Defendant Town of Stratford moves for summary judgment on all counts of plaintiff's Amended Complaint. (Dkt. #75). Specifically, defendant Town asserts that summary judgment is appropriate with respect to: plaintiff's Title VII claims asserted in Counts One and Two because defendant's hiring decisions with respect to the position for which plaintiff applied were made for legitimate, non-discriminatory reasons; plaintiff's claim in Count Three for violation of CONN. GEN. STAT. § 46a-60(a)(1), as such claim is analyzed under the same framework as the Title VII claims and defendant's hiring decisions were made for legitimate, non-discriminatory reasons; plaintiff's claim in Count Five alleging First Amendment retaliation for union activity against defendant Miron in his official capacity as directed against defendant Town, because even if union membership touched upon a matter of public concern, plaintiff can point to no evidence that supports a causal connection between plaintiff's conduct and defendant's actions, and to the extent that plaintiff alleges retaliation for filing her prior lawsuit, the prior lawsuit did not touch upon a matter of public concern and plaintiff can point to no evidence that supports a causal connection between her conduct and defendant's

actions; and plaintiff's Fourteenth Amendment equal protection clause claim in Count Seven because defendant's hiring decisions with respect to the position for which plaintiff applied were made for legitimate, non-discriminatory reasons.  (Dkt. #75, Brief at 8-31).

Similarly, defendant Miron moves for summary judgment with respect to plaintiff's § 1983 claim against him individually, as alleged in Count Eight, because the decision not to hire plaintiff was made for legitimate, non-discriminatory reasons, and plaintiff's claim against Miron is barred by the doctrine of qualified immunity (Dkt. #77, Brief at 8-24); and defendant Miron asserts that he is entitled to summary judgment on the First Amendment retaliation claims against him in Count Six because plaintiff cannot establish a causal connection between her conduct and defendant's actions.  (Id. at 24-29).

In response, as to her First Amendment retaliation and equal protection claims alleged in Counts Six and Eight against defendant Miron individually, plaintiff contends that defendant Miron is not entitled to qualified immunity.  (Dkt. #88, at 17-21).[14]  Plaintiff also posits that defendant Town concedes that plaintiff established her prima facie case for both gender and gender plus race discrimination under Title VII; defendants have not met their burden as plaintiff possessed more of the qualifications in the job posting, and plaintiff's background and experience made her a better fit for the job; and defendants' reasons for hiring Maffett are "merely a pretext for discrimination."  (Id. at 21-39; see also Dkt. #89).[15]

In their reply brief, defendants assert that there is no evidence that plaintiff was not hired because of a discriminatory motive, but rather, that she was "simply the least qualified

---

[14]Plaintiff addresses Counts Five and Six in her cross motion for summary judgment. (Dkt. #79, Brief at 11-31; see also Dkt. #88, at 10-17).

[15]In response to defendant Town's Motion for Summary Judgment, plaintiff incorporates by reference the entirety of her brief in opposition to defendant Miron's Motion, with the exception of the qualified immunity section.  (Dkt. #89, at 1-2).

of the three finalists." (Dkt. #101, at 3-5).  Additionally, defendants reiterate that plaintiff

fails to establish a causal connection between her purported protected speech or her prior

lawsuit to her alleged retaliation, and plaintiff's reference to other firefighters has little

relevance to this case as they rely on beliefs or opinions, and do not demonstrate facts

relative to this particular case. (Id. at 6-8).  Defendants also contend that defendant Miron

is entitled to qualified immunity under these circumstances, there is no binding, mandatory

authority on the issue of whether mere participation in a union satisfied the public concern

requirement, and plaintiff's claim regarding the telephone interview and questions about her

husband lack substance.  (Id. at 8-10).

<u>2. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Plaintiff cross moves for summary judgment on Counts Five and Six of her Amended

Complaint on grounds that plaintiff satisfies a prima facie case of First Amendment retaliation;

defendants cannot justify their failure to promote plaintiff on other grounds; and defendants

failure to promote was motivated by retaliatory animus and not fear of disruption. (Dkt. #79,

Brief at 11-31).

In response, defendants[16] contend that plaintiff cannot make a claim against

defendant Miron in his individual capacity; that plaintiff's claim that the decision not to

promote plaintiff because of her membership in the union is barred by qualified immunity

because at the time the decision was made, mere membership in a union was not a protected

activity clearly defined by law; and, as to both Counts Five and Six, plaintiff cannot establish

a casual connection between her union membership and defendants' decision not to promote

---

[16]While plaintiff moved for summary judgment on Counts Five and Six directed toward defendant Miron, defendant Town joins in the objection to the extent that Count Five raises a claim against defendant Miron in his official capacity.  (Dkt. #83, at 1, n.1).

her, and defendants would have taken the same action regardless of plaintiff's union membership.  (Dkt. #83, at 2, 7-16).

In her reply brief, plaintiff contends that defendants' objection fails to set forth admissible evidence to create a material factual dispute as to whether defendants would have taken the same adverse employment action in the absence of plaintiff's union activity.  (Dkt. #98, at 2).  She also reiterates that defendant Miron is not entitled to qualified immunity, and defendants' objection as to causation is baseless.  (Id. at 3-8).

### 3. PLAINTIFF'S MOTION TO STRIKE DEFENDANT MIRON'S AND DEFENDANT TOWN OF STRATFORD'S EXHIBITS

Plaintiff moves to strike four exhibits attached to each defendant's Motion for Summary Judgment: the Maffett Reference Summary; the Kepchar Resume; the Maffett Resume; and Plaintiff's Resume (Exhs. B, D, E, & F, respectively), on grounds that these exhibits were appended without any proof of authenticity, and therefore should be stricken from the record.  (Dkts. ##86-87, 97).  In response, defendants submit an affidavit of the Ronald Ing, the Human Resources Director for the Town of Stratford, who attests to the admissibility and authenticity of these documents. (Dkts. ##99-100).

Rule 901(a) of the Federal Rules of Evidence provides that the authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." FED. R. EVID. 901(a).  "[T]o authenticate a document, a witness with personal knowledge to that effect need only testify that the document is what it purports to be." Lachira v. Sutton, No. 3:05 CV 1585 (PCD), 2007 WL 1346913, at *2 (D. Conn. May 7, 2007)(citations & internal quotations omitted).  Notably, "the witness need not have personal knowledge of the underlying events described in the document, the substance[,] or the accuracy of the document[.]" Id. (citation & internal quotations omitted).

In this case, Ing sets forth in his affidavit that as part of his duties and in the normal course of business as Human Resources Director for defendant Town, he maintains and has access to the Town's employment records, and thus he is familiar with the contents of the personnel files of Kepchar, Maffett and plaintiff, and is familiar with the circumstances and facts involved in this pending litigation (Ing Aff't ¶¶ 3-4); these documents are accurate and identical copies of the records contained in the personnel files, and are "routinely made in the regular course" of the Town's business (id. ¶ 6); and the documents were made at or around the time of the circumstances that are described within.  (Id.).

In addition, the Federal Rules of Evidence allow for the "business records exception" to the hearsay rule for records of regularly conducted activity, such as the records at issue. See FED. R. EVID. 803(6).  Ing has laid the foundation for that exception as the records were made at or near the time by someone with knowledge, the records were kept in the regular course of business, making the records was a regular practice of that activity, these conditions are shown by the testimony of the custodian, Ing, who serves as the Human Resources Director for defendant Town, and neither Ing, nor the method or circumstances of preparation, indicate a lack of trustworthiness. FED. R. EVID. 803(6); see Tavares v. Sam's Club, 178 F. Supp. 2d 96, 101, n.2 (D. Conn. 2001)(personnel manager averred that he maintains and is familiar with defendants' personnel records, which are admissible under the business records exception).   Accordingly, plaintiff's Motions to Strike (Dkts. ##86-87, 97) are denied.

### B. STANDARD OF REVIEW

The standard for summary judgment is well established.  The moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and

that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). This showing may be made by depositions, affidavits, interrogatory answers, admissions, or other exhibits in the record. FED. R. CIV. P. 56(c). "[O]n summary judgment the inferences to be drawn from the underlying facts contained in the [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion." Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970), quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment.'" Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 59 (2d Cir. 2006), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### 1. COUNT ONE - GENDER DISCRIMINATION

In Count One, plaintiff asserts a claim against defendant Town under Title VII for discrimination based upon gender. (Amended Compl. ¶¶ 55-60). Specifically, plaintiff alleges in her Amended Complaint that the Town knowingly and willfully discriminated against her on the basis of her gender in denying her a promotion to Deputy Fire Chief, for which position she was qualified. (Id.). Defendant Town moves for summary judgment on this claim on grounds that its hiring decision was made for legitimate, non-discriminatory reasons, and plaintiff can point to no evidence that reasonably supports a finding that the Town's reasons were pretextual. (Dkt. #75, Brief at 8-19).

Title VII of the Civil Rights Act makes it unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because

of such individual's race, color, religion, sex, or national origin."  42 U.S.C. 2000e-2(a)(2013).

In failure-to-promote cases brought under Title VII, courts follow the Title VII burden-shifting framework set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-07 (1973).  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-49 (2000);  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993)["Hicks"];  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-56 (1981)["Burdine"].  Plaintiff can establish a prima facie case of intentional discrimination by showing: (1) that she is a member of a protected class; (2) she applied and was qualified for the position; (3) she was subject to an adverse employment decision; and (4) the decision occurred under circumstances giving rise to an inference of discrimination. See Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010), citing McDonnell Douglas, 411 U.S. at 802.


A plaintiff's burden of establishing a prima facie case is not an "onerous" one, see Burdine, 450 U.S. at 253-56, but rather has been described as "de minimis."  Kerzer v. Kingly Mfg., 156 F.3d 396, 401 (2d Cir. 1988)(multiple citations omitted).  If plaintiff satisfies her prima facie case, the burden then shifts to defendant to rebut the presumption of discrimination by producing evidence of a legitimate, non-discriminatory reason for the adverse employment action taken.  McDonnell Douglas, 411 U.S. at 802.  If defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and the burden shifts back to plaintiff to prove that she was discriminated against.  Burdine, 450 U.S. at 255-56.  Plaintiff must prove that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination.  McDonnell Douglas, 411 U.S. at 804-05; accord Vivenzio, 611 F.3d at 106.  At all times, the ultimate burden of persuasion remains

with the plaintiff to show that the defendant intentionally discriminated against the plaintiff. Hicks, 509 U.S. at 507, citing Burdine, 450 U.S. at 253.

Defendant Town's briefs do not appear to dispute that plaintiff has satisfied her prima facie case.  (See, e.g., Dkt. #75, at 11 (beginning the analysis with establishing legitimate, non-discriminatory reasons for not promoting plaintiff); Dkt. #101, at 3 (addressing same)). To meet its burden of articulating a non-discriminatory reason for taking an adverse employment action, "an employer's explanation for its reasons must be clear and specific in order to afford the employee a full and fair opportunity to demonstrate pretext."  Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 105 (2d Cir. 2001)(citation & internal quotations omitted).  Defendant acknowledges that plaintiff was "qualified for the position," but it explains that she was not offered the position because she "lacked the substantive leadership experience offered by both Kepchar and Maffett[.]"  (Dkt. #75, Brief at 16).  Defendant, relying on the testimony of Chief Cavanaugh, explains that the reason that Kepchar and Maffett were ranked ahead of plaintiff, and that Maffett was ultimately hired,[17] is that they were more qualified than plaintiff in that "each had experience as a chief officer of a fire department and demonstrated experience in administrative and organizational aspect of fire department management[,]" which experience is "directly referenced in the respective resumes of Kepchar and Maffett."  (Dkt. #75, Brief at 15, citing Cavanaugh Depo. at 73; Cavanaugh Aff't ¶¶ 9-17; Kepchar Resume; Maffett Resume).

Relying on the resumes of each of these candidates, defendant defeats the rebuttable presumption of discrimination by offering, through admissible evidence, that its decision to hire Maffett over plaintiff was justified based on Maffett's experience, and not based on

---

[17]See note 22 infra.

unlawful discrimination against plaintiff due to her gender. This Court has the duty of "examin[ing] the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of the employer." Byrnie, 243 F.3d at 102, citing Howley, 217 F.3d at 151 (additional citations omitted).  Plaintiff, in a case such as this, where "direct evidence of an improper discriminatory bias" is lacking, "must defeat summary judgment on the strength of [her] prima facie case combined with circumstantial evidence that [defendant's] stated reasons for failing to hire [her] is pretext" for "impermissible discrimination." Id., citing Reeves, 530 U.S. at 143.  "A prima facie case coupled with 'sufficient evidence' to reject the defendant's explanation may permit a finding of liability." Johnson v. Conn. Dept. of Admin. Svs, No. 3:11 CV 1106(VLB), 2013 WL 5187147, at *25 (D. Conn. Sept. 13, 2013), quoting Reeves, 530 U.S. at 149.

In addressing its burden, defendant Town contends that "[a]side from her own subjective beliefs regarding the resumes and her being 'better qualified,' . . . [p]laintiff points to no evidence in support of her contention that the Town's decision not to hire her was based upon her gender."  (Dkt. #75, at 13; see Plaintiff's Depo. at 58 (other than comparing resumes, plaintiff has no knowledge of any statements or explicit decisions by the Town not to hire plaintiff because of her gender or race)).  Plaintiff, however, alleges that she "met or exceeded all of the qualifications for Deputy Chief[,]" she had twenty-seven years experience, twenty of which as an officer with the SFD, and she had a "spotless[]" personnel record. (Plaintiff's Aff't ¶¶ 24-25).  Plaintiff also alleges that Maffett is less qualified than she, and defendants knew that Maffett was less qualified, yet hired him because of his race and gender, and in retaliation against plaintiff for her "prior lawsuit against the Town and [for her]

23

union activity." (Id. ¶¶ 42-43).[18]   Plaintiff also testified that because her resume and job performance were superior to the resumes of Kepchar and Maffett, the only reason she was not hired is her gender.  (Plaintiff's Depo. at 88 ("I can't come up with another reason why I wasn't chosen. The deciding factor if you put everything equal is I was a female.")).[19]

        "A plaintiff seeking to prove that a discrepancy in qualifications supports an inference of pretext faces a formidable burden."  Johnson, 2013 WL 5187147, at *25.  As the Second Circuit has explained:

> When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination.

Byrnie, 243 F.3d at 103. "The law is well-established that federal courts hearing discrimination claims do not sit as a super-personnel department to reexamine . . . business decisions about how to evaluate the relative merits of education and experience in filling job positions." Newsom-Lang v. Warren Int'l, Inc., 80 F. App'x 124, 126 (2d Cir. 2003)(citation & internal quotations omitted).  Thus, to satisfy her burden, plaintiff's "credentials would have to be so superior" to those of Kepchar and Maffett that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in

---

        [18]Specifically, plaintiff alleges that during her interview with Miron on July 27, 2009, he inquired about whether she would be able to supervise her husband if she was promoted to Deputy Chief (id. ¶ 36); Chief Cavanaugh conceded that the Panel had concerns whether plaintiff would be able to represent Stratford as its representative in labor negotiations where her husband might be part of the union's negotiating team.  (Cavanaugh Depo. at 108-10).  Miron did not make that inquiry of the male candidates, but plaintiff acknowledges that the male applicants did not have spouses that they would supervise; that notwithstanding, she contends that these questions were "inappropriate[.]" (Plaintiff's Depo. at 139).

        [19]Plaintiff admits that she has no personal knowledge of either Kepchar's or Maffett's job performance.  (Plaintiff's Depo. at 89).

question." Byrnie, 243 F.3d at 103 (citations & internal quotations omitted).   This a is "weighty burden[]" that plaintiff cannot satisfy in this case. Id.

The job announcement for the position of deputy fire chief reads: (1) "[c]andidates should have a bachelor's degree in fire service management or a related area"; (2) "at least ten (10) years of progressively responsible fire service experience," including, (3) "at least (2) two years at the shift supervisor level, or higher, in a fire department the size of Stratford's or larger[]"; and (4) "[c]andidates should . . . possess, or be able to obtain, certifications as Fire Officer I and Fire Instructor I issued by the State of Connecticut." (Defendants' 56(a)1 Stmt ¶ 7; Plaintiff's 56(a)2 Stmt ¶ 7; Undisputed Facts ¶ 33).   Additionally, as stated in the posting, the SFD candidates with "[a]t least three years previous experience as a Deputy Chief in a comparably, or larger, sized fire department may be substituted for a [b]achelor's degree[,]" and "Fire Officer II or III certification or a master's degree in fire service management or a related field or graduation from the Executive Officer Program at the National Fire Academy [was] preferred." (Id.).

Plaintiff contends that she possessed all of the required qualifications for the job. (Dkt. #88, at 24-25). Plaintiff has a bachelor's degree in physical education from Southern Connecticut State University (Plaintiff's Depo. at 14), which degree she explained is related to fire service management as it taught her "how to teach motor skills, physical activity to people.  It's a teaching degree and a huge part of an officer's job is to teach people." (Id. at 60).  Yet, upon further questioning at her deposition, plaintiff acknowledged that her degree in physical education is not related to fire services management.  (Id.).  Maffett's resume reveals that in 1999 he obtained a "Dillard University Special Diploma[,]" (Maffett Resume, at 2), which plaintiff, relying on her "Google" search of Dillard University, contends is not a

real diploma.  (Plaintiff's Depo. at 80-81).  Plaintiff acknowledged, however, that this search did not reveal what diplomas or courses were offered by Dillard University in 1999 when Maffett was in attendance there.  (Id. at 81).   Defendants, however, have offered no evidence that Maffett, in fact, possessed a bachelor's degree, which is a listed requirement for the position. Kepchar has a bachelor's degree in marketing.  (Kepchar Resume, at 6; Plaintiff's Depo. at 72-73).   Thus, while plaintiff contends that she satisfied the first requirement of the job posting, her own concession undermines her contention and places her in the same category as Kepchar and Maffett in that they all lack a bachelor's degree in fire services management or a related area.[20]  Additionally, plaintiff's concession minimizes her argument that the job requirements were lessened for Kepchar and Maffett, but increased for her, since she lacked a relevant bachelor's degree, and she lacked the substitute qualification, as discussed further below, but yet, in Chief Cavanaugh's opinion, she was still considered "qualified[.]" (Cavanaugh Aff't ¶ 14).   Additionally, defendant Miron also acknowledged that plaintiff was "very qualified," and "was respected and had immense qualifications."  (Miron Depo. at 221).

        The job listing provides that a relevant bachelor's degree may be substituted by at least three years previous experience as a Deputy Chief in a comparably, or larger, sized fire department.  None of the three candidates' resumes reveals previous experience as a "Deputy Chief[.]" (See Plaintiff's Resume; Maffett Resume; Kepchar Resume).  At the time of their

---

[20]Plaintiff asserts that "Maffett misrepresented his academic credentials; he has no [b]achelor's [d]egree."  (Dkt. #98, at 4)(emphasis omitted).  However, Maffett's resume does not represent that he has a [b]achelor's degree, let alone a [b]achelor's degree in fire services management; he represents that he has a "Special Diploma." (Maffett Resume, at 2); see note 27 infra.  As addressed below, there is a substitute qualification listed in the job posting that, if satisfied, substitutes for the absence of a bachelor's degree in fire services management or a related area.

applications all three[21] applicants held the position of Assistant Chief: Kepchar was an Assistant Chief in the Westport Fire Department, Maffett was an Assistant Chief in the City of Columbia Fire Department, and plaintiff was an Assistant Chief in the SFD.  (Id.).  Plaintiff contends that according to the Town's own advertisement, Maffett, the ultimate hiree,[22] would be required to serve as a "Deputy Chief" and not just a "chief officer" in order for his experience to substitute for a bachelor's degree.  (Dkt. #88, at 26).[23] The job posting allowed for the substituted qualification of service as a "Deputy Chief" in a "comparably, or larger sized department."  It does not say service as a "Deputy Chief" or comparable position, nor is there an explanation of the description of assistant chief positions, referred to as chief officer positions, as they relate to the description of a deputy chief position.  Maffett's resume lists his last two positions in the Columbia, South Carolina Fire Department as "Assistant Chief" positions, and in his application, he states that his most recent position was "Assistant Chief of Human Resources[,]" where he reported to "Deputy Chief Jenkins[.]"  (Maffett Resume at 1, 6).  Thus, at least in his former department, his position was inferior to a deputy chief position.

_____

[21]As previously indicated, see Section I supra, initially four applicants proceeded to the interview stage: Thomas Connor, a white male from Bridgeport Fire Department; Robert Kepchar, a white male from the Westport Fire Department; Curtis Maffett, a black male who was a retired assistant to the chief from the Columbia, South Carolina, Fire Department; and plaintiff. (Cavanaugh Aff't ¶ 7; Miron Aff't ¶ 7).  Connor was eliminated from consideration at this interview stage. (Cavanaugh Depo. at 73).

[22]As discussed above, the position was initially offered to Kepchar, but the offer was withdrawn after Kepchar attempted to negotiate the salary. (Plaintiff's 56(a)1 Stmt ¶ 57, n.7; Defendants' 56(a)2 Stmt ¶ 57; Miron Aff't ¶ 10; Cavanaugh Aff't ¶ 19; Miron Depo. at 182-83; Cavanaugh Depo. at 92-93).   Following the withdrawal of the offer to Kepchar, the Town offered the position to Maffett, who was hired as Deputy Chief in August 2009.  (Defendants' 56(a)1 Stmt ¶ 25; Plaintiff's 56(a)2 Stmt ¶ 25; Plaintiff's 56(a)1 Stmt ¶ 57; Defendant's 56(a)2 Stmt ¶ 57; Undisputed Facts ¶ 42; Miron Aff't ¶ 11; Cavanaugh Aff't ¶ 20).

[23]Because plaintiff lacks a relevant bachelor's degree, her argument applies to her in equal force.

As Chief Cavanaugh explained, Maffett came from a much larger fire department, consisting of over four hundred firefighters. (Cavanaugh Aff't ¶ 12; Cavanaugh Depo. at 87). As Cavanaugh continued, "[g]iven the size of the Columbia Fire Department, the titles and descriptions of the positions within that department do not align with those of the [SFD]," as the Columbia Fire Department has district chiefs, assistant district chiefs, and battalion chiefs. (Id. ¶ 13).  From 1997 to his retirement in 2006, Maffett held the positions of Assistant Chief of Support Services, Assistant Chief of Operations, and Assistant Chief of Human Resources, and prior to holding these assistant chief positions, Maffett served as the Fire Battalion Chief and as the Fire Captain of his department. (Maffett Resume, at 1).[24]   As plaintiff acknowledged, SFD does not have these positions because it is a much smaller department. (Plaintiff's Depo. at 151).[25]

Chief Cavanaugh explained that Maffett's experience impressed the interview panel as Maffett "supposedly served as the chief officer in every aspect of the department, . . . [a]nd he knew all kinds of people in the National Fire Organizations . . ., and . . . he was coming from a right to work state which [the interview panel] thought could bring something new to the table." (Cavanaugh Depo. at 87-88).  It is undisputed that Maffett had thirty-four years of fire service experience compared to plaintiff's twenty-seven years experience, although plaintiff's progressive fire service and shift supervisor experience was within the very

---

[24]Similarly, Kepchar served as an assistant chief/shift commander in Westport, had served as deputy fire marshal and had supervised and directed "all aspects of the hiring of sixteen (16) firefighters, including advertising, testing, oral panels and final decision."  (Kepchar Resume, at 4-6).

[25]While plaintiff does not include this information on her resume, see note 28 infra, she avers that the "Assistant Chiefs act as shift commanders and each carries an additional specific assignment. [Plaintiff was] responsible for the four firehouses and the equipment."  (Plaintiff Aff't ¶ 14).  She also avers that SFD has ninety-six firefighters and a $10 million dollar budget.  (Id.).

department that the Deputy Chief would manage, while Maffett's progressive experience was in another state with different labor laws.  However, defendants argue that Maffett's and Kepchar's experience was rated as more valuable because they "each had experience as a chief officer of a fire department and demonstrated experience in administrative and organizational aspects of fire department management." (Dkt. #75, Brief at 15).

Plaintiff testified at her deposition that the entirety of her claim that she was discriminated on the basis of her gender and/or race stems from her comparison of resumes and information obtained in the application process.  (Plaintiff's Depo. at 72, 92). She testified that her review of the resumes and qualifications of these two applicants reveal that Kepchar did "not have the number of college courses that [plaintiff] had towards a degree[,]" but plaintiff also acknowledged that at that time, she had only taken one course towards her master's degree (Plaintiff's Depo. at 73, 76, 125);[26] Kepchar does not have an EMT certification, although she acknowledged that such a certification is not required for the job (id. at 73); she opined that she has a "much better medical background[]" than Kepchar, although that too was not a requirement for the job, and she had more citations and awards (id. at 76); and while acknowledging that Maffett has a medical background, and attended the National Fire Academy "on a couple of occasions[,]" she opined that Maffett did not have a sufficient level of interest in his community, and, as discussed above, she contends that his diploma from Dillard University is not a real diploma. (id. at 79-81).[27] Defendants note that

_____

[26]On her resume, plaintiff states that she has "numerous credits" from Waterbury State Technical College, toward a Fire Science and Administration degree, and she "[a]ttended various courses on Leadership" at Housatonic Community College. (Plaintiff's Resume, at 1).

[27]Plaintiff points to an Executive Summary Concerning the Results of the Report of Investigation by the Inspector General of the District of Columbia as support for her contention that Maffett "misrepresented his academic credentials" in that he has no bachelor's degree.  (Dkt. #98, at 3-4 & Exh. A).  Maffett reports on his resume that he has a "Special Diploma" from "Carl

a comparison of the resumes reveals more overall experience by both Kepchar and Maffett than plaintiff, and, as Cavanaugh averred, plaintiff's resume was "more in public service than in fire service." (Cavanaugh Aff't ¶ 14).[28] Chief Cavanaugh acknowledged that he initially preferred to hire internally, and to hire plaintiff specifically, but that his opinion changed based on what he learned during the interviews. (Cavanaugh Depo. at 91).[29] Specifically, he was impressed with Kepchar's experience as a "chief officer" and that Kepchar designed apparatus replacement, and he was impressed with Maffett's experience in a department with more than four hundred firefighters where "he supposedly served as the chief officer in every

_____

Holmes Executive Development Institute – Dillard University."  (Maffett Resume, at 2).  Unlike Ronnie Few, the individual investigated by the Inspector General for the District of Columbia for resume fraud, who represented that he had an "Arts & Sciences" degree from Morris Brown College, Maffett did not reference that a degree was conferred, he referenced a "Special Diploma[.]"  (Dkt. #98, Exh. A; Maffett Resume, at 2).  Maffett clearly stated on his resume that his "Dillard University Special Diploma" was from the "Carl Holmes Executive Development Institute – New Orleans, LA[,]" at which he completed "Modules I-V in Executive Fire Services Management[.]" (Maffett Resume, at 2).  Similarly, Maffett notes on his resume that in 1997, through the Carl Holmes Executive Development Institute – New Orleans, LA[,]"  he completed "Module IV, EDI – Dillard University[;]" in 1996, through the Carl Holmes Executive Development Institute – Tallahassee, FL[,]" he completed "Module II, EDI – Florida A&M University[,]" and in 1995, through the "Carl Holmes Executive Development Institute – Tallahassee, FL[,]" he completed "Module I, EDI – Florida A&M University[.]" (Maffett Resume, at 2-3).

[28]Plaintiff's resume strictly lists the positions she had held in the SFD, without any description of her duties, and she highlights her many awards, citations, educational courses and certifications, and the many community service events in which she was involved, coordinated or led. (Plaintiff's Resume, at 1).  Conversely, Kepchar and Maffett detail their professional experience in each of their roles as assistant chiefs.  (Compare Kepchar Resume, at 4-9 with Maffett Resume, at 1, 6).

[29]Plaintiff also contends that she was the only finalist denied a telephone interview and "[g]ender is the only factor that differentiates candidates who received a telephone interview and those that did not." (Dkt. #88, at 31; see also Plaintiff's Depo. at 141).  While plaintiff contends that the "importance of this telephone interview should not be underestimated[,]" (Dkt. #88, at 31), plaintiff cannot establish that she was harmed by not receiving the telephone interview as despite not receiving a telephone interview, she "made it to the final round[]" in the selection process.  (Plaintiff's Depo. at 141).

aspect of the department . . . ."   (Cavanaugh Depo, at 71, 87-88).[30]   Similarly, Kepchar

represented that he had thirty years of experience, including five years as assistant chief, and

had overseen the hiring process of sixteen firefighters.  (Kepchar Resume, at 4-7).  Maffett

was "responsible for overseeing the process of recruiting, hiring, and promotions[]" and he

operated the cadet firefighter training program and safety program.  (Maffett Resume, at 1).

The Panel was particularly impressed with Kepchar because he created a program to reduce

overtime costs in the Westport Fire Department, and Kepchar had experience "organizing

other sections, other areas of the department . . . ." (Cavanaugh Depo. at 73-74; Cavanaugh

Aff't ¶ 10).

     Plaintiff also contends that defendants knew Maffett was less qualified in that the

---

[30]Additionally, plaintiff asserts that a review of Maffett's personnel file from Columbia, South Carolina, reveals that she is a superior candidate, but she also admits that she has no "personal knowledge" of his job performance, and she testified that she did not believe the Town even had Maffett's personnel file when they hired him.  (Plaintiff's Depo. at 89-90).

     Plaintiff relies on the Second Circuit's finding in her previous litigation to conclude that, just as in that case, the Town's showing that a more qualified applicant was hired over plaintiff is "unpersuasive." (Dkt. #98, at 3; see Howley, 217 F.3d at 1151-53).  However, the facts of the previous litigation differ greatly from the facts here.  In that case, as plaintiff cites in her brief, the hiree, Jay Cybart, was ranked third by the assessment panel, whereas plaintiff was the one ranked third in this case and Kepchar, the initial hiree, and Maffett, the final hiree, were ranked first and second, respectively.  Id. at 164.  Additionally, in that case, the Town relied on Cybart's resume to demonstrate that he was the most qualified candidate but in litigation, the only resume that the Town proffered was a "December 1994 memorandum written by Cybart three months after he was hired." Id. at 152.  Conversely, in this case, the Town was in possession of the applicants' resumes, reference summaries, and completed applications, and interviewed each of the three top candidates before offering the position first to Kepchar, and then to Maffett.  While ignoring the Reference Summary complied by Slavin Management, plaintiff contends that this case is like Howley in that the Town relied on Maffett's resume but did not verify his actual qualifications.  (Dkt. #98, at 3).

     Additionally, it is worth noting that Howley was decided in June 2003, almost one year before the Second Circuit's decision in Byrnie, in which the Second Circuit made clear that for plaintiff to defeat summary judgment on her failure to promote claim she must show that her "credentials . . . [were] so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff . . . ."  Byrnie, 243 F.3d at 103 (citation omitted).

Human Resources Department Reference Summary prepared by Randi Frank states: "Mr. Maffett's references were asked if they could recommend him for this position.  They all responded in the positive and added that they'd recommend him <u>with hesitation</u>."  (Maffett Reference Summary)(emphasis added).  John Slavin of Slavin Management Consultants was responsible for conducting reference checks for Randi Frank to assist in the executive search of the Fire Chief and Deputy Fire Chief positions.  (Slavin Aff't ¶¶ 4-5).  Slavin avers that this statement on which plaintiff relies contains a typographical error in that Maffett's references "in fact stated that they would recommend him 'without hesitation.'" (<u>Id.</u> ¶¶ 8-10).  This explanation is in accord with the first portion of the sentence, "They all responded in the positive . . . ."  (Maffett Reference Summary).  Notably, this explanation is also in accord with the entire Reference Summary which only includes positive feedback about Maffett.  (<u>Id.</u>).  Specifically, the references described Maffett as professional, moral and ethical, straightforward, and honest, and the references articulated eight positive professional strengths.  (<u>Id.</u>).  The references noted that Maffett "[t]akes direction very well[,]" "[i]s responsive[,]" and is a "clear and effective" communicator.  (<u>Id.</u>).  Additionally, his "military" leadership style was described as "participatory[,]" and he is "well respected by all his commands."  (<u>Id.</u>).  None of the forgoing suggests that "all" of the recommenders who "responded in the positive" when asked if they would recommend Maffett for the SFD position, would have responded that they would have recommend him with hesitation.  (<u>Id.</u>).  Thus, reading the Maffett Reference Summary in conjunction with the explanation averred to by its author, John Slavin, the Reference Summary contains a typographical error and there is no evidence, as plaintiff contends, that defendants knew that Maffett was less qualified.

As for the remaining job qualifications, plaintiff was a twenty-seven year employee of

the SFD (Plaintiff's Depo. at 88), with two years experience as an Assistant Chief, as compared to Kepchar's five years as an Assistant Chief, and Maffett's nine years as an Assistant Chief.  Like Kepchar, plaintiff has Fire Officer I and Fire Instructor I certifications (Plaintiff's Depo. at 60; Kepchar Resume, at 3, 6-7), but neither she nor Maffett have the preferred qualifications of Fire Officer II or III certifications, or hold a master's degree in fire service management or a related field or graduation from the Executive Officer Program at the National Fire Academy.  (Kepchar Resume, at 3, 6-7).  While plaintiff alleges that at the time she applied for the position of Deputy Chief, her qualifications were superior to Kepchar and Maffett as she was "working towards" a masters in Public Safety (Plaintiff's Depo. at 15-16, 125), she testified that the degree was from an on-line university, in her words, she "believe[d]" the degree is in fire administration, or "along those lines, public safety[,]" she never obtained that degree, and she had only taken one course "at some point between 2008 and 2009."  (Plaintiff's Depo. at 15-16, 125).  Pursuant to the job listing's requirements, Maffett, whose resume reflects substantial management experience and "[thirty-four] years of progressive experience in fire services[,]"  (Maffett Resume, at 1), needed only to "be able to obtain[ ] certifications for Fire Officer I and Fire Instructor I issued by the State of Connecticut[,]" (Defendants' 56(a)1 Stmt ¶ 7; Plaintiff's 56(a)2 Stmt ¶ 7; Undisputed Facts ¶ 33), and thus it is of no moment that he did not have those certifications at the time of hire. Hence, despite plaintiff's contentions to the contrary, she cannot establish that her credentials are "so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate over the plaintiff for the job in question.'" Byrnie, 243 F.3d at 103 (citations omitted). Plaintiff's subjective belief is not supported by the underlying record.

33

This Court is mindful of the fact that it "must respect the employer's unfettered discretion to choose among qualified candidates." Id. (citations & internal quotations omitted). In this case, plaintiff's subjective belief that her resume and job performance are superior to that of Kepchar and Maffett is not "sufficient evidence to find that the employer's asserted justification is false[.]" Reeves, 530 U.S. at 148.  Rather, the record evidence, taken in the light most favorable to plaintiff, supports a conclusion that defendant, at best, assessed the three final applicants' respective experiences against the stated requirements for the job, which weighed in favor of each of the three candidates at various stages in the selection process, but with that, defendant chose its hires among candidates with experience and qualifications that exceeded those held by plaintiff.  Plaintiff cannot demonstrate that the Town's explanation for not hiring plaintiff was "pretextual, [and] that pretext served to mask unlawful discrimination" based on plaintiff's gender.  Byrnie, 243 F.3d at 103(citations omitted).  Accordingly, summary judgment is granted in defendant Town's favor on Count One.

## 2. COUNT TWO - GENDER PLUS RACE DISCRIMINATION

In Count Two, plaintiff asserts a claim against defendant Town under Title VII for discrimination based upon gender plus race in denying plaintiff a promotion to Deputy Fire Chief.  (Amended Compl. ¶¶ 61-62).  "The term 'sex plus' or 'gender plus' is simply a heuristic.  It is, in other words, a judicial convenience developed in the context of Title VII to affirm that plaintiffs can, under certain circumstances, survive summary judgment even when not all members of a disfavored class are discriminated against." Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 118 (2d Cir. 2004)(footnote omitted).  Defendant Town contends that plaintiff fails to establish a prima facie case of gender plus race discrimination

with respect to the Town's decision to initially offer the position for which she applied to Kepchar, given that Kepchar and plaintiff are both white.  (Dkt. #75, Brief at 19, 20)(citation omitted). The term "gender plus" "refers to a policy or practice by which an employer classifies employees on the basis of sex plus another characteristic." Back, 365 F.3d at 118, n.7 (citation & internal quotations omitted).   In "gender plus" cases, "the employer does not discriminate against the class of men or women as a whole but rather treats differently a subclass of men or women."  Id. (citation & internal quotation omitted).    Even assuming that plaintiff's satisfied her prima facie case regarding Maffett, plaintiff's gender plus race claim fails for the same reason her gender discrimination claim fails. Just as with her gender discrimination claim, plaintiff's contention that she was not hired solely because of her gender plus race is premised upon her subjective belief that her resume and job performance were superior to Maffett and Kepchar.  (Plaintiff's Depo. at 88).  As discussed thoroughly in Section II.B.1. supra, the record evidence supports defendant's legitimate, non-discriminatory reasons for hiring Maffett as a comparison of the resumes reveals more substantive, and more overall, experience by Maffett.

### 3. COUNT THREE

In Count Three, plaintiff asserts against defendant Town a violation of the Connecticut Fair Employment Practices Act ["CFEPA"], CONN. GEN. STAT. § 46a-6(a)(1)[31] for discrimination

---

[31]Pursuant to CONN. GEN. STAT. § 46a-60(a)(1):

> It shall be a discriminatory practice in violation of this section: . . . For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, gender identity or expression, marital status, national origin, ancestry, present or past history of mental disability, intellectual disability, learning disability or physical disability,

based upon gender in the denial of her promotion to Deputy Fire Chief. (Amended Compl. ¶¶ 63-68). Defendant Town moves for summary judgment on this Count. Under Connecticut law, the same burden-shifting analysis employed in Title VII claims is applied to claims under CONN. GEN. STAT. § 46-60. Kaytor v. Elec. Boat Corp., 609 F.3d 537, 556 (2d Cir. 2010)(citation omitted)("The analysis of discrimination claims under CFEPA is the same as under Title VII."). Accordingly, for the reasons stated in Section II.B.1. supra, summary judgment is granted as to Count Three of plaintiff's Amended Complaint.

### 4. COUNTS FIVE AND SIX

In Count Five, plaintiff asserts a claim against defendant Miron in his official capacity under 42 U.S.C. § 1983 for First Amendment retaliation because of association, due to her participation in union activity. (Amended Compl. ¶¶ 74-79). While this Count is alleged against defendant Miron in his official capacity, the "real party in interest" is the Town. State Emp. Bargaining Agent Coalition v. Rowland, 494 F.3d 71, 84-85, n. 8 (2d Cir. 2007), quoting Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)["Graham"]. As the Second Circuit explained:

> Official capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.

Id. quoting Graham, 473 U.S. at 165-66. Accordingly, both the defendant Town and defendant Miron move for summary judgment on this Count. (Dkt. #75, Brief at 24-30; Dkt. #77, Brief at 24-29). Additionally, in Count Six, plaintiff asserts a claim under 42 U.S.C. § 1983 for First Amendment retaliation due to her participation in union activity, against Miron

including, but not limited to, blindness . . . .

in his individual capacity.[32]   (Amended Compl. ¶¶ 80-84).   Defendant Miron moves for summary judgment on this Count.   (Dkt. #77, Brief at 20-29).   Plaintiff cross moves for summary judgment on both Counts Five and Six.   (Dkt. #79, Brief at 8-22).

Public employees, merely by accepting public employment, do not "relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the [government's] operation[.]"   Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).   "The right to free association is 'a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.'"   State Emp. Bargaining Agent Coalition v. Rowland, 718 F.3d 126, 132 (2d Cir. 2013), quoting Shelton v. Tucker, 364 U.S. 479, 485-86 (1960)(additional citation omitted), cert. denied sub nom. Malloy v. State Emp. Bargaining Agent Coalition, 2014 WL 25214 (Jan. 2, 2014). "[T]he First Amendment rights of public employees extend[] more generally to all forms of First Amendment expression, including associational activity." Cobb v. Pozzi, 363 F.3d 89, 104 (2d Cir. 2004)(emphasis in original).  To succeed on a First Amendment claim brought pursuant to Section 1983, plaintiff must "demonstrate that (1) the conduct at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected [her] constitutionally protected conduct, and (3) a causal relationship existed between the constitutionally protected conduct and the retaliatory action." Wrobel v. County of Erie, 692 F.3d 22, 27 (2d Cir. 2012)(citation

---

[32]In order to hold defendant Miron personally liable for a constitutional violation pursuant to § 1983, plaintiff "must show that . . . [d]efendant[] [was] personally involved in the alleged violation of [her] First Amendment associational rights." Castagliuolo v. Danaher, No. 3:09 CV 418 (VLB), 2011 WL 1220595, at *13 (D. Conn. Mar. 29, 2011)(multiple citations omitted).  Plaintiff must establish that defendant Miron intentionally participated "in the conduct constituting a violation" and defendant Miron "knew of the facts rendering" his conduct illegal.  Id. (citation & internal quotations omitted).  Plaintiff must prove that her protected conduct was a substantial motivating factor in the adverse employment action, so that the defendant's state of mind is necessarily at issue in a retaliation case.  Id. (citation omitted).

omitted).  In an action for retaliation, a plaintiff bears the "initial burden of showing that an improper motive played a substantial part in defendant's action." <u>Scott v. Coughlin</u>, 344 F.3d 282, 288 (2d Cir. 2003).  The burden "then shifts to defendant to show it would have taken exactly the same action absent improper motive." <u>Id.</u> (citations omitted).  "[E]ven if there is evidence that the adverse employment action was motivated in part by protected [activity], the government can avoid liability if it can show that it would have taken the same adverse action in the absence" of the protected activity.  <u>Anemone v. Metro. Transp. Auth.</u>, 629 F.3d 97, 114 (2d Cir. 2011)(citation & internal quotations omitted).  Alternatively, defendants can prevail on a motion for summary judgment if they show that "the employee's speech was likely to sufficiently disrupt government activities so as to outweigh the First Amendment value of the plaintiff's speech." <u>Donovan v. Inc. Village of Malverne</u>, 547 F. Supp. 2d 210, 217 (E.D.N.Y. 2008)(citation omitted).  This is known as the <u>Pickering</u> balancing test, which entails arriving "at a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of public services it performs through its employees." <u>Pickering</u>, 391 U.S. at 568.  This test is "deeply fact dependent." <u>Ricciuti v. Gyzenis</u>, 832 F. Supp. 2d 147, 161 (D. Conn. 2011)(citation omitted).

<u>a. FIRST ELEMENT- CONSTITUTIONALLY PROTECTED CONDUCT</u>  "A

public employee bringing a First Amendment freedom of association claim must

persuade a court that the associational conduct at issue touches on a matter of public concern." <u>Cobb</u>, 363 F.3d at 102 (multiple citations omitted).   In her Amended Complaint, plaintiff alleges that defendant Miron was aware of her participation in the union as a whole and as a local bargaining unit, and he retaliated against her by denying her a promotion

because of her participation in such union activity.  (Amended Compl. ¶¶ 75-77).  Last year, the Second Circuit again "stated that it cannot be questioned that the First Amendment's protection of speech and associational rights extends to labor union activities."  State Emp. Bargaining, 718 F.3d at 132 (citations and internal quotations omitted).  "[T]he Constitution protects associational rights of the members of . . . union[s,]" Bhd. of R.R. Trainmen v. Virginia ex rel Va. State Bar, 377 U.S. 1, 8 (1964), and it is a "well-established principle that union activity is protected by the First Amendment[.]" State Emp. Bargaining, 718 F.3d at 134 & n. 10 (citing cases recognizing a First Amendment cause of action for firings based on union membership).

"Although the Second Circuit has declined to rule on the issue of whether, in the absence of union activity, 'pure union membership' is enough to satisfy the public concern requirement," several courts within this Circuit "have determined that union membership in and of itself satisfies the public concern requirement . . . ." Donovan, 547 F. Supp. 2d at 218 (multiple citations omitted); see also Castagliuolo v. Danaher, 3:09 CV 418 (VLB), 2011 WL 1220595, at *13 (D. Conn. Mar. 29, 2011)(citations omitted)(recognizing the holding of other districts courts within this Circuit that union membership in and of itself satisfies the public concern requirement, but holding, in that case, that plaintiffs' activities went "beyond mere membership[]" as plaintiffs were at the "forefront of efforts to organize a union[,]" and thus that activity satisfied the "public concern" element); see Maglietti v. Nicholson, 517 F. Supp. 2d 624, 634-35 (D. Conn. 2007)("the court finds that union membership analogously can be associational activity that touches on public concern.").[33]  Similarly, other circuits have

---

[33]Additionally, once the Assistant Chiefs became part of the firefighter's union, they, including plaintiff and her husband, negotiated for the inclusion of overtime pay in pension benefit calculations, which calculation method increased the Town's financial liability to retiring firefighters. (Miron Depo. at 172, 175, 177).  "Since the wages of public employees bear directly on the overtly

recognized a First Amendment cause of action arising out of adverse actions based on union membership.  See McLaurin v. City of Jackson Fire Dept., 217 F. App'x 287, 288 (5th Cir. 2006)("We assume without deciding that membership in a union constitutes a protected activity."); Hanover Twp. Fed'n of Teachers v. Hanover Cmty. Sch. Corp., 457 F.2d 456, 460 (7th Cir. 1972)(citations omitted)("a discharge because of union membership[]" violates "the general constitutional right of free association"); Am. Fed'n of State, Cnty., & Mun. Emps. v. Woodward, 406 F.2d 137, 139 (8th Cir. 1969)(citations omitted)(holding that city could not fire employees because they joined a labor union, as "[u]nion membership is protected by the right of association under the First and Fourteenth Amendments.").  In sum, the Second Circuit and courts within and outside of this Circuit have articulated their support of labor union activities as a component of the First Amendment's right to free association.[34] Accordingly, this Court concludes that plaintiff has satisfied the first element of her First Amendment retaliation claim.

b. SECOND ELEMENT - ADVERSE ACTION

---

political issue of state [and local] budgets, including the appropriate levels of public expenditure and taxation, the 'economic' advocacy of public employee unions touches directly on matters of public concern."  State Emp. Bargaining, 718 F.3d at 134, n.7 (citation omitted).

[34]As plaintiff also points out (Dkt. #88, at 12), the Second Circuit has held that:

> An individual's association with an organization can be deemed to involve expression on a matter of public concern in either of two ways.  First, the organization itself may engage in advocacy on a matter of public concern.  If it does, the individual's association with the organization may constitute, at least vicariously, expressive conduct on a matter of public concern.  Second, even where the organization itself does not purport to engage in advocacy on matters of public concern, the individual's association with the organization may--although it does not necessarily---constitute approval or an endorsement of the nature and character of the organization.  Such approval or endorsement itself would constitute expressive conduct on a matter of public concern if the nature or character of the organization is a matter of public concern.

Piscottano v. Murphy, 511 F.3d 247, 274 (2d Cir. 2007)(citations omitted).

40

As for the second element, there is no dispute that the failure to promote plaintiff amounts to an adverse employment action.  See Mandell v. Cnty. of Suffolk, 316 F.3d 368, 383 (2d Cir. 2003)(citation omitted)(adverse employment action includes failure to promote).

### c. THIRD ELEMENT - CAUSATION

Plaintiff can establish a causal connection between "protected expression and an adverse employment action indirectly 'by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.'" Castagliuolo, 2011 WL 1220595, at *13, quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999), abrogated on other grounds by Lore v. City of Syracuse, 670 F.3d 127 (2d Cir. 2012).  Plaintiff "may not rely on conclusory assertions of retaliatory motive to satisfy the causal link."  Cobb, 363 F.3d at 108, citing Morris, 196 F.3d at 111.   Rather, plaintiff "must produce 'some tangible proof to demonstrate that [her] version of what occurred was not imaginary.'" Id., quoting Morris, 196 F.3d at 111  (internal quotations omitted).   Additionally, plaintiff may rely on the "temporal proximity" of the protected action and the adverse employment action, which must be "very close." Risco v. McHugh, 868 F. Supp.2d 75, 113-14 (S.D.N.Y. 2012), citing Cobb, 363 F.3d 108 (additional citations omitted).

Defendant Miron contends that the evidence is clear that the decision not to hire plaintiff was based on the qualifications and performance of the candidates, and therefore plaintiff can point to no causal connection between defendant's conduct and her union activity.  (Dkt. #77, Brief at 26-27; Dkt. #83, at 16; see Dkt. #101, at 3-4).   Additionally, defendant Miron asserts that the record establishes that defendant would have taken the same action of hiring Kepchar or Maffett over plaintiff because of their qualifications and performance, regardless of plaintiff's union membership.  (Dkt. #83, at 16; see Dkt. #101,

at 3-4). Conversely, plaintiff contends that summary judgment should be granted in her favor in that plaintiff's associational activity was a motivating factor in the Town's failure to promote her (Dkt. #79, Brief at 18-24); defendants cannot justify their failure to promote plaintiff on other grounds (id. at 24-29); and plaintiff can still prevail because defendants' failure to promote was motivated by retaliatory animus and not a fear of disruption. (Id. at 29-31).

### i. UNION INVOLVEMENT

Plaintiff has presented enough evidence to establish that a question of fact exists as to whether her union membership was a motivating factor in defendant's Town's decision not to promote her.  Plaintiff was a member of the firefighter's union, Local 998, from 1982 until the time she was promoted to Assistant Chief in January 2007.  (Plaintiff's 56(a)1 Stmt ¶ 5; Defendants' 56(a)2 Stmt ¶ 5; Miron's Resp. 10/5/12 ¶ 6; Town's Resp. 10/5/12 ¶ 6).  When plaintiff was in the position of Assistant Chief, in 2008, the Assistant Chiefs of the SFD, which also included her husband, retired Assistant Chief Thomas Murray, negotiated for inclusion in the firefighter's union.  (Plaintiff's 56(a)1 Stmt ¶ 10; Defendants' 56(a)2 Stmt ¶ 10; Miron's Resp. 10/5/12 ¶¶ 10-16, 50-52; Town's Resp. 10/5/12 ¶¶ 10-16, 50-52; Miron Depo. at 109). Thomas Murray was an active participant in the union, serving on numerous boards and committees.  (Plaintiff's 56(a)1 Stmt ¶ 6; Defendants' 56(a)2 Stmt ¶ 6; Undisputed Facts ¶ 10; Miron's Resp. 10/5/12 ¶¶ 10-16, 50-52; Town's Resp. 10/5/12 ¶¶ 10-16, 50-52; T. Murray Aff't ¶ 4).  His work with the firefighter's union particularly involved matters related to municipal pensions, and he was regarded as the "go-to" person for firefighters with department issues, union issues, and legal issues, and as Chief Cavanaugh explained, Thomas Murray's involvement in the union resulted in him not being well-liked within Stratford Town Hall.  (Plaintiff's 56(a)1 Stmt ¶ 7; Defendants' 56(a)2 Stmt ¶ 7; Cavanaugh Depo. at 107-08,

110).  Plaintiff was as enthusiastic, interested, and dedicated to the firefighter's union as her husband.  (Plaintiff's 56(a)1 Stmt ¶ 9; Defendants' 56(a)2 Stmt ¶ 9; Cavanaugh Depo. at 108).

The Assistant Chiefs of the SFD, including plaintiff, rejoined the firefighter's union in September 2008 after extensive, contentious negotiations with the Town. (Plaintiff's 56(a)1 Stmt ¶ 10; Defendants' 56(a)2 Stmt ¶ 10; Cavanaugh Depo. at 106; Miron Depo. at 109; Miron's Resp. 10/5/12 ¶ 7; Town's Resp. 10/5/12 ¶ 7).[35]  The Assistant Chiefs' reentry to the bargaining unit was opposed by public officials representing the Town. (Anderson Aff't ¶ 7).  During these negotiations, defendant Miron had discussions with several Assistant Chiefs, including Assistant Chief Thomas Murray, who were supportive of the Assistant Chiefs rejoining the union.  (Plaintiff's 56(a)1 Stmt ¶ 13; Defendants' 56(a)2 Stmt ¶ 13; Miron Depo. at 109, 196).

Once the Assistant Chiefs became part of the firefighter's union, they, including plaintiff and her husband, negotiated for the inclusion of overtime pay in pension benefit calculations, which calculation method increased the Town's financial liability to retiring firefighters.  (Miron Depo. at 172, 175, 177).  Plaintiff testified at her deposition that she, and the three other Assistant Chiefs, were told "to be careful what we wished for . . ., which [plaintiff] took as a threat against the assistant chiefs that joined [the union.] They wanted to take some benefits away from us." (Plaintiff's Depo. at 102; see id. at 107-10).  Similarly, Greg Anderson, the firefighter's union Vice President since 2010, averred that he heard David Dunn, an outside labor consultant for the Town, make this statement, and that Town's

---

[35]However, plaintiff clarified that she "wasn't privy to the negotiations because, . . . they can't discuss it, but afterwards apparently they wanted to strip all of our benefits from us and start from square one."  (Plaintiff's Depo. at 103; see id. at 109).

Director of Human Resources, Winterbottom, repeated the statement immediately thereafter. (Anderson Aff't ¶¶ 5, 8). Dunn acknowledges that he stated words to the effect of "Be careful of what you wish for, you may get it[,]" which was not meant "to intimate that there would be repercussions or retaliation[,]" but which "had to do with certain privileges and rights that the assistant chiefs enjoyed as non-union members that were not available to union members." (Dunn Aff't ¶¶ 6-8). He denies that Winterbottom ever made this statement. (Id. ¶ 10).[36] However, in addition to plaintiff and Anderson, Daniel Hunsberger, the attorney for the union, avers that at one of the meetings involving the Assistant Chiefs' negotiations to be re-incorporated into the collective bargaining unit, Winterbottom warned the Assistant Chiefs, "Be careful what you wish for because you just might get it." (Hunsberger Aff't ¶¶ 3-4, 9). Like plaintiff and Anderson, Hunsberger "understood this statement to be a threat that if the Assistant Chiefs continued to seek union membership, that the Town would make sure they regretted it." (Id. ¶ 10). This disputed question of fact remains an issue for the jury.

When defendant Miron decided to run for Mayor, he sought to address several issues affecting the Town, including the reduction of Town costs, which defendant Miron identified as a major issue. (Plaintiff's 56(a)1 Stmt ¶ 19; Defendants' 56(a)2 Stmt ¶ 19; Miron Depo. at 51, 55). During his administration, defendant Miron was involved in negotiating several collective bargaining agreements and would try to keep raises as small as possible (Plaintiff's 56(a)1 Stmt ¶ 21; Defendants' 56(a)2 Stmt ¶ 21; Miron Depo. at 97, 101). Under defendant

---

[36] Plaintiff also offers an affidavit from former Chief Jay Cybart who served as Fire Chief in 2007 when plaintiff and Thomas Murray were promoted to Assistant Chiefs. (See Cybart Aff't ¶¶ 8-9). Chief Cybart avers that during his time as Chief, he spoke to Winterbottom and Miron to request that Assistant Chiefs be given raises, and he was told that "Assistant Chiefs will have to negotiate their raises and that the Assistant Chiefs were at fault for joining the union." (Cybart Aff't ¶ 14). According to Cybart, "Winterbottom made it clear to me that Miron viewed the Assistant Chiefs, as disgruntled employees." (Id. ¶ 15).

Miron's administration, the Assistant Chiefs did not receive a pay raise prior to 2008, while the unionized workers did.  (T. Murray Aff't ¶ 8; Hunsberger Aff't ¶ 6; Cybart Aff't ¶ 11).

Defendant Miron admitted that the Mayor and a member of a collective bargaining unit have different roles, and while both aim to ensure that the public gets a "good value" for their public officials, members of a collective bargaining unit have a different take on how that looks.  (Plaintiff's 56(a)1 Stmt ¶ 37; Defendants' 56(a)2 Stmt ¶ 37; Miron Depo. at 187).  He acknowledged that when he was interviewing the final three candidates for the deputy fire chief position, the purpose of the interview with him was to decide if the person fits within his administration.  (Plaintiff's 56(a)1 Stmt ¶ 23; Defendants' 56(a)2 Stmt ¶ 23; Miron Depo. at 166).[37]  One of his focuses as Mayor was to "reduce overtime expenses[.]" (Plaintiff's 56(a)1 Stmt ¶ 25; Defendants' 56(a)2 Stmt ¶ 25; Miron Depo. at 167).  Defendant Miron admitted that overtime costs and pension costs were big concerns for him; specifically, he was concerned with the fact that the SFD would routinely exceed its overtime budget, and their overtime was used to calculate a firefighter's pension. (Plaintiff's 56(a)1 Stmt ¶ 27-29; Defendants' 56(a)2 Stmt ¶ 27-29; Miron Depo. at 172, 175, 177). He acknowledged that he saw the inclusion of overtime in the pension calculation as a problem because it increased the Town's liability for prospective pension benefits.  (Plaintiff's 56(a)1 Stmt ¶ 30; Defendants' 56(a)2 Stmt ¶ 30; Miron Depo. at 175).  Thus, in accord with the Town's position to try to control costs by various means, defendant Miron sought to limit the scope of the term "compensation" in the pension agreement to exclude overtime pay in the calculation of

---

[37]Plaintiff also contends that defendants decided not to fill the positions of Fire Chief and Deputy Fire Chief by promoting from within which had been the past practice for promotional positions.  (Plaintiff Aff't ¶ 13).   According to plaintiff, "[s]ince 1990, in three out of four cases, the Deputy Chief position had been filled by an internal candidate without any testing." (Id. ¶ 16; see also id. ¶¶ 17, 19-20).

firefighters' pension benefits, but the firefighter's union would not agree to that change. (Plaintiff's 56(a)1 Stmt ¶ 31,36; Defendants' 56(a)2 Stmt ¶ 31,36; Miron Depo. at 177; Cavanaugh Depo. at 37; see Anderson Aff't ¶ 9 ("[T]he Town sought to deprive the Assistant Chiefs of every benefit they had before rejoining the union and many of the benefits they would have had as a member of the union.")).[38]  Hunsberger viewed Miron's attempt to negotiate reduced benefits that would be applicable only to the Assistant Chiefs as retaliation against the Assistant Chiefs as Winterbottom had warned.  (Hunsberger Aff't ¶ 11).

Defendant Miron admitted that he took all factors into consideration when hiring someone, that he did not look at things in a vacuum when making employment decisions, and that he looked at "how the real world affects decisions." (Plaintiff's 56(a)1 Stmt ¶ 19; Defendants' 56(a)2 Stmt ¶ 19; Miron Depo. at 85, 87).  However, despite his acknowledged involvement in the union negotiation process, and plaintiff's deposition testimony to the contrary, defendant Miron claimed at his deposition that he did not know if plaintiff was supportive of the Assistant Chiefs returning to the union.  (Miron Depo. at 196). Similarly, he testified that he thought that Thomas Murray was supportive of the Assistant Chiefs returning to the union but he did not know if he attended negotiations.  (Id.).  However, he also acknowledged that during these very negotiations, he had discussions with several Assistant Chiefs, including Assistant Chief Thomas Murray, who were supportive of the Assistant Chiefs rejoining the union.  (Id. at 109).  Chief Cavanaugh testified that Winterbottom and Susan McCauley, the Director of Finance, initially raised concern that Thomas Murray's union activity might make plaintiff a less effective deputy chief.  (Cavanaugh Depo. at 109).  Chief Cavanaugh nonetheless clarified that "it wasn't union involvement that brought the whole

---

[38]As plaintiff acknowledged, ultimately, the Town did not unilaterally take any benefits or compensation from her after she joined the union.  (Plaintiff's Depo. at 103).

subject up. It was about their marital status." (Id. at 110). However, he also observed that he thought Winterbottom and McCauley had the impression that plaintiff would not have a smooth transition into the position of Deputy Chief because her husband was not well liked as a result of his union activity. (Id. at 107-110). That said, the interview process included inquiry into the applicants' involvement with unions. Specifically, Kepchar was asked if he had experience negotiating with a union (Cavanaugh Depo. at 72), and Maffett's experience "coming from a right to work state" "perked quite an interest in the [T]own[,]" (id. at 88), as Chief Cavanaugh admitted that he viewed this experience positively as Maffett could know how to "get around the union[.]" (Id.).

"[E]ven if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence" of the protected activity. Anemone, 629 F.3d at 114 (citation omitted).[39] As discussed at length in Section II.B.1. supra, a review of the resumes and qualifications of Kepchar and Maffett reveal their qualifications and experience, which exceed that possessed by plaintiff. However, defendant Miron testified that plaintiff was "obviously, very qualified[.]" (Miron Depo. at 221). In light of the evidence posited about plaintiff's and her husband's union activity, the perceived threat made by the Director of Human Resources of the Town, and defendant Miron's position regarding cost containment measures and the Assistant Chiefs re-joining the union in 2008, there exists a question of fact as to the impact plaintiff's union involvement and activity had on the ultimate decision not to promote plaintiff. Summary judgment cannot be granted in favor of defendant or plaintiff on

---

[39]In their briefs, defendants do not challenge plaintiff's argument that her associational conduct would not have disrupted defendants' activities as to outweigh the importance of her First Amendment right to association. (See Dkt. #79, Brief at 26-29; Dkts. ##75, 77, 83).

this issue. A reasonable jury could conclude, in light of the evidence, that the decision not to promote plaintiff was based only upon the qualifications and performances of the candidates, or a reasonable jury could equally conclude defendants considered plaintiff's union involvement along with the candidates' qualifications and performances, and that defendants refused to promote plaintiff, less than a year after the Town's contentious negotiations with the firefighter's union, in retaliation for her involvement.  See Lomotey v. State of Conn. Dept. of Transp., 3:05 CV 1711 (PCD), 2009 WL 82501, at *11 (D. Conn. Jan. 12, 2009)(causation may be demonstrated when the "protected activity and the adverse employment action . . . [are] sufficiently close in time to support an inference that the two are related."), aff'd, 355 F. App'x 478 (2d Cir. 2009).

## ii.  PREVIOUS LAWSUIT

Although not specifically included in Counts Five and Six, plaintiff does mention in her Amended Complaint that defendants' actions were motivated by a desire to retaliate against her for her previous lawsuit, Howley v. Town of Stratford, No. 3:97 CV 532 (AVC),  filed in 1997. (Amended Compl. ¶ 54).  Plaintiff testified at her deposition that she believes that her prior lawsuit "was a sore spot for the [T]own[,]" and "had a part" in plaintiff being passed over for promotion.  (Plaintiff's Depo. at 92).  As just indicated, to demonstrate causation between plaintiff's previous lawsuit and the alleged retaliation by defendants in their failure to promote plaintiff, the "protected activity and the adverse employment action must be sufficiently close in time to support an inference that the two are related." Lomotey, 2009 WL 82501, at *11.  "Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity." Kaytor, 609 F.3d at 552 (citations omitted).

"Temporal proximity of the adverse action to the protected activity is a key indicator of retaliation[,]" however, "[t]he operative issue is not simply the length of time between the protected activity and the alleged retaliation but the demonstrated nexus between the two." Lomotey, 2009 WL 82501, at *11. "In this Circuit, an inference of causation is defeated (1) if the allegedly retaliatory [action] took place at a temporal remove from the protected activity; or (2) if there was an intervening causal event . . . ." Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005)(citation omitted).

In Lomotey, the late Senior U.S. District Judge Peter Dorsey held that because of the temporal proximity "of several months between [p]laintiff's CHRO testimony and complaints and his subsequent failures to be promoted, as well as the lack of direct evidence suggestive of retaliation, [p]laintiff . . . failed to demonstrate a causal relationship[.]" 2009 WL 82501, at *12. In this case, plaintiff's prior lawsuit was filed in 1997, eight years prior to defendant Miron taking office, and that case was decided following appeal in 2000, which was nine years prior to the decision not to hire plaintiff in this case. In this case, the Court agrees with defendants that the temporal proximity is "far too tenuous for this Court to find that there was any causal connection" between the Howley lawsuit and any alleged retaliatory conduct.[40] (Dkt. #101, at 7).[41]

---

[40]Additionally, defendant Miron testified at his deposition that he had little knowledge of plaintiff's lawsuit. (See Miron Depo. at 197, 199).

[41]A lawsuit that seeks to "redress . . . personal grievances" as opposed to advancing a "public purpose[,]" does not constitute speech on a matter of public concern. Ruotolo v. City of New York, 514 F.3d 184, 189 (2d Cir. 2008)(citation omitted). Thus, "retaliation against the airing of generally personal grievances is not brought within the protection of the First Amendment by the mere fact that one or two" of the public employee's comments could be construed to implicate matters of public concern or some "broader public purpose." Id. at 190 (citation & internal quotations omitted). However, in light of the conclusion above, the Court need not determine whether plaintiff's previous lawsuit, in which she alleged that she was discriminated against in the Town's failure to promote her and that the Town permitted a hostile work environment in which she was subjected to sexual harassment, "concern[ed] essentially personal  grievances and the

5. QUALIFIED IMMUNITY

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutor[y] or constitutional rights of which a reasonable person would have known." Fabrikant v. French, 691 F.3d 193, 212 (2d Cir. 2012)(citations & internal quotations omitted).   "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. (citation & internal quotations omitted).  For a defendant to secure summary judgment on qualified immunity grounds, "looking at the evidence in the light most favorable to, and drawing all inferences most favorable" to plaintiff, defendant must show that no reasonable jury "could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right."   Rapkin v. Rocque, 228 F. Supp. 2d 142, 148 (D. Conn. 2002)(citation, footnote & internal quotations omitted).

Defendants contend that because plaintiff's First Amendment retaliation claims "stem solely from her membership in the union[,]" and whether "union membership alone touches upon a matter of public concern was not clearly established at the time of . . . [d]efendant's actions[,]" defendant Miron is entitled to qualified immunity as "no reasonably-trained official would have known that his conduct, even if it did constitute retaliation based on union membership alone, was illegal."  (Dkt. #83, at 6-7; see also Dkt. #101, at 8).   However, as discussed in Section II.B.4.c.1. supra, plaintiff's activity with the union involved more than

relief" she sought was for herself alone, and thus, whether the lawsuit was "not speech on a matter of public concern[.]"  Id.

mere union membership.  Under defendant Miron's administration, the Assistant Chiefs did not receive a pay raise prior to 2008, while the unionized workers did (T. Murray Aff't ¶ 8; Hunsberger Aff't ¶ 6; Cybart Aff't ¶ 11), and defendant Miron's treatment of the Assistant Chiefs, including plaintiff, led them to join the collective bargaining unit, which they did in September 2008 after extensive, contentious negotiations with the Town. (Plaintiff's 56(a)1 Stmt ¶ 10; Defendants' 56(a)2 Stmt ¶ 10; Undisputed Facts ¶¶ 16-17; Cavanaugh Depo. at 106; Miron Depo. at 109; Miron's Resp. 10/5/12 ¶ 7; Town's Resp. 10/5/12 ¶ 7).  The Assistant Chiefs' reentry to the bargaining unit was opposed by public officials representing the Town (Anderson Aff't ¶ 7), and once the Assistant Chiefs became part of the firefighter's union, they, including plaintiff and her husband, negotiated for the inclusion of overtime pay in pension benefit calculations, which calculation method increased the Town's financial liability to retiring firefighters.  (Miron Depo. at 172, 175, 177).  The Second Circuit has held that "[s]ince the wages of public employees bear directly on the overtly political issue of state [and local] budgets, including the appropriate levels of public expenditure and taxation, the 'economic' advocacy of public employee unions touches directly on matters of public concern." State Emp. Bargaining, 718 F.3d at 134, n. 7 (citation omitted).  Moreover, a U.S. Magistrate Judge in the Eastern District of New York observed in Donovan, issued in 2008, that despite the absence of a decision by the Second Circuit on the issue of "whether 'pure union membership' is enough to satisfy the public concern requirement," several courts within the Circuit "have determined that union membership in and of itself satisfies the public concern requirement . . . ."  547 F. Supp. 2d at 218 (multiple citations omitted); see also Castagliuolo, 2011 WL 1220595, at *13 (multiple citations omitted); Maglietti, 517 F. Supp. 2d at 633-34.  In light of the foregoing, if a jury finds for plaintiff on Count Six of her Amended Complaint,

defendant Miron cannot establish at this juncture that no reasonable jury "could conclude that it was objectively unreasonable for [him] to believe that he was acting in a fashion that did not clearly violate an established federally protected right." Rapkin, 228 F. Supp. 2d at 148 (citation, footnote & internal quotations omitted).

### 6. COUNTS SEVEN AND EIGHT

In Counts Seven and Eight, plaintiff alleges a violation of her rights under the equal protection clause, under 42 U.S.C. § 1983, against defendant Miron in his official and individual capacity, respectively.[42]   (Amended Compl. ¶¶ 85-92). Defendants move for summary judgment on these counts on grounds that the decision not to hire plaintiff was made for legitimate, non-discriminatory reasons.  (Dkt. #75, Brief at 30-31; Dkt. #77, Brief at 9-20).

"The Equal Protection Clause of the Fourteenth Amendment is essentially a direction that all persons similarly situated should be treated alike." Brown v. City of Syracuse, 673 F.3d 141, 151 (2d Cir. 2012)(citations & internal quotations omitted).  "In the context of a § 1983 suit where 'the color of state law is established, [an] equal protection claim parallels [a] Title VII [employment discrimination] claim.'" Abdul-Hakeem v. Parkinson, 523 F. App'x 19, 20 (2d Cir. 2013), quoting Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004)(additional citation omitted & alteration in original); see also Back, 365 F.3d at 123 (applying McDonnell Douglas framework to § 1983 case).  The difference in the two is that a § 1983 claim, unlike a Title VII claim, can be brought against individuals.  Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006), citing Feingold, 366 F.3d at 159 & n.20.  Because "[t]he elements of [a Title VII claim] are generally the same as the elements of [an equal protection claim,] . . . the two

---

[42]See note 32 supra.

must stand or fall together." <u>Feingold</u>, 366 F.3d at 159 (citations omitted); <u>see also Mills v. Southern Conn. State Univ.</u>, 519 F. App'x 73, 75 (2d Cir. 2013)(plaintiff's equal protection claim fails for substantially the same reason as her Title VII claim); <u>see Maraschiello v. City of Buffalo Police Dept.</u>, 709 F.3d 87, 92, n.1 (2d Cir.)(same), <u>cert denied</u>, 134 S. Ct. 119 (2013).  Accordingly, because plaintiff's Title VII claims do not survive, plaintiff's § 1983 claims must also fail.

<u>III. CONCLUSION</u>

For the reasons set forth below, defendant Town of Stratford's Motion for Summary Judgment (Dkt. #75) is <u>granted in part and denied in part</u> such that summary judgment is entered in defendant Town's favor on Counts One, Two, Three, and Seven, and on Count Five with respect to plaintiff's prior lawsuit, and summary judgment is denied on Count Five with respect to plaintiff's union membership and activity;

defendant Miron's Motion for Summary Judgment (Dkt. #77) is <u>granted in part and denied in part</u> such that summary judgment is granted on Count Eight and on Count Six with respect to plaintiff's prior lawsuit, and summary judgment is denied on Count Six with respect to plaintiff's union membership and activity;

plaintiff's Motion for Partial Summary Judgment (Dkt. #79) is <u>denied</u> on Counts Five and Six;

and plaintiff's Motions to Strike (Dkts. ##86, 87, 97) are <u>denied</u>.

Counsel are to contact this Magistrate Judge's Chambers for a telephonic scheduling conference with respect to filing a Joint Trial Memorandum, jury selection, and jury trial, with respect to Counts Five and Six only, regarding plaintiff's allegations of retaliation based upon her union membership and activity.

Dated this 11th day of February, 2014, at New Haven, Connecticut.


 /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge